(No. 35214.—

INLAND STEEL COMPANY, Defendant in Error, *vs.* INDUSTRIAL COMMISSION *et al.*—(MINNIE HELEN HELMKE, Plaintiff in Error.)

*Opinion filed November 18, 1959—Rehearing denied Jan. 18, 1960.*

ABRAHAM W. BRUSSELL, of Chicago, (BERNARD KLEIMAN, of Chicago, of counsel,) for plaintiff in error.

PEREGRINE, GIFFORD, MOORE & PEREGRINE, and MAYER, FRIEDLICH, SPIESS, TIERNEY, BROWN & PLATT, both of Chicago, (HERBERT A. FRIEDLICH, WILLIAM J. WELSH, and FRANCIS E. SCHLAX, of counsel,) for defendant in error.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This court has allowed the petition for writ of error filed by plaintiff in error, Minnie Helen Helmke, to review a judgment of the superior court of Cook County, setting aside an award of the Industrial Commission for the death of her husband, allegedly as a result of accidental injuries arising out of and in the course of his employment for defendant in error, Inland Steel Company.

Inasmuch as the essential inquiry in this cause is whether the superior court erred in concluding that the death benefit award was contrary to the manifest weight of the evidence, it is incumbent upon us to review the record.

It appears that on October 26, 1954, some 10 days prior to the alleged accident, decedent, an electrician em-

ployed by the defendant company for some 28 years, was given a preretirement physical examination, since he was 65 years old. The report disclosed some hypertension, his blood pressure being 170 over 96, and some myocardial changes of a sclerotic nature, but was marked "O.K." It was also revealed that the electrocardiogram showed no coronary insufficiency, and that the cardio-vascular outlines were well within normal limits. Decedent's retention in employment apparently indicated that he had passed the examination.

There was testimony that prior to November 5, 1954, the day of the alleged accident, decedent enjoyed good health and was "jokey, and very friendly and very active." His helper, Anthony Balassone, who had worked with him for several years, described him as "agile," "active" and "cheerful," and stated that decedent never missed a day of work.

On November 5, 1954, according to Balassone's testimony, he and decedent were wiring up a forced air heater, and as decedent put his hand into the switch box to install the fuse, he immediately "hollered" that the switch box was "hot," and jumped back about four feet, reacting "in a frightened manner like shock." Balassone explained that "hot" meant that the wire had some live electricity running through it, and that the switch box was "hot" when the switch handle was in the "off" position.

The helper immediately informed Davis, the assistant foreman of the Electrical Department, that decedent had received a "shock" or jolt, and Davis found that the switch box, which bore the specifications of 440 volts, 3-phase, 60 cycle, 30 amperes and 7½ horsepower, was defective. According to Davis's testimony, the switch handle was in the "off" position, but the blades of the switch were jammed in, causing the top fuse clips to be "alive," so that anyone touching the clips while installing the fuse would get some electric current, "as much current as could find its way to the ground under a pressure of 440 volts." Davis

then repaired the switch. He further testified that decedent told him that "those fuse clips were live," and that he replied, "Yes, I know it." He then asked decedent how he felt, and decedent replied, "All right."

Decedent worked the remaining two hours of November 5, and the next day, which was Saturday. The following week he worked the night shift, while his helper, Balassone, and Davis continued working days, and, therefore, saw decedent only briefly when he came to work at the change of shifts. Davis testified that decedent seemed natural, and did his work "as always," and that there was no occasion to pay any particular attention to decedent as distinguished from any of the other 20 employees under his supervision.

Decedent's wife testified that between the time of this electric shock and his death one week later, she observed a marked physical and mental change in him. He seemed very depressed and looked like he was in pain because he kept rubbing the back of his head with both hands. A day or so prior to his death, while they were sleeping, decedent suddenly thrust out his arms in a piston-like motion. It woke her, and when she tried to hold him down, she felt a "terrible pull." She woke decedent and he just looked at her and went back to sleep. This was repeated several times, although it had never occurred before.

On the morning of November 11, 1954, decedent took his wife to work, as he had each morning while he was on the night shift. He arrived at his own job at 5 P.M., and was assigned the job of standby electrician, to provide light and handle miscellaneous tasks while repairs were under way on a flange motor jack which had broken down prior to his arrival. A fellow employee, Otto Helmke, no relation to decedent, testified that he saw decedent four or five times during the evening, and that decedent then appeared normal, but that at 5 A.M., after decedent had worked approximately twelve hours, decedent came over to him at

the substation and complained that his head hurt. He then appeared white and was holding the back of his head. Decedent commented that he thought the air compressor was turned off, although it was not, and had been running continually.

Decedent remained at the substation about 10 minutes, and then remarked that he had better go home. After being assured that his duties would be taken over by the fellow employee, decedent washed up. As he left, he walked slowly, carefully and unsteadily, and when the fellow employee said, "I'll see you tomorrow night, Otto," decedent answered, "Maybe, if I ain't dead by that time."

When decedent arrived home he had, according to the testimony of his wife, "a funny look on his face." He was pale, but had fiery red cheeks, and appeared to be in great pain and chilled. He vomited and bubbles of perspiration stood out on his face. His wife went to a neighbor's home to telephone a doctor, and when she returned she heard a death rattle, and decedent died. Resuscitation efforts of the pulmotor squad and the doctor were ineffectual.

Six medical witnesses testified before the Industrial Commission. Doctors Maurice O. Grossman, Victor Levine and Max Sadove testified in response to the hypothetical question incorporating the evidence that there could or might be a causal connection between the episode of electric shock on November 5, 1954, and the death of decedent the morning of November 12, 1954. Doctors Eric Oldberg, George Coe and Jerry J. Kearns testified in response to the hypothetical question that the electric shock or jolt did not cause the subsequent death.

In support of his opinion that the death of decedent was due to cerebral vascular accident induced by electric shock, Dr. Grossman, a neuropsychiatrist, stated that the headaches in the occipital area, the tonic contraction of the upper extremities during sleep, and the personality changes, which could best be determined by one in close contact,

rather than by a business associate, were symptomatology typical of both a cerebral type of death and of contact with electricity. He explained that there may be delayed or immediate reactions to electrical contact, and that in case of delayed death there is an increase in the tension of the blood vessels, and eventually the greater strain would lead to a tearing of the intima or lining of the blood vessels, producing small hemorrhages and then larger hemorrhages in the brain. This would be particularly likely to occur to an individual with hypertension. He further explained that electric current can pass through the brain without disturbing mental capacity, and still harm the brain by producing increased pressure in the blood vessels, and on the cerebral vascular system, which will eventually, with continued activity, result in a cerebral vascular insult.

Dr. Levine, a pathologist, also testified on the effect of electric current on the brain. He, too, stated that death 6 or 7 days following an electric jolt is consistent with a hemorrhage having its inception at the time of the jolt, the hemorrhage being small at first and then becoming larger, with the symptoms presenting themselves as the hemorrhage becomes progressive in character. He agreed that an individual can have a cerebral hemorrhage and yet carry on his employment for a certain period of time.

Dr. Sadove, a surgeon and anesthesiologist who had checked the effect of electricity on the human body on hundreds of patients who had received therapeutically administered electricity, stated that the shock either caused a rise in blood pressure, which, in turn resulted in hemorrhages in a hypertensive individual, or it caused an inflammation of the blood vessels, which can, with the passage of time, cause an obstruction of the blood vessel and produce a varying degree of collapse and death, as late as 9 days later. He stated that in the hypothetical case, electricity could have caused a degenerative change in the vascular wall, which ruptured, or which became thrombosed,

and that this seemed evident to him from the bridging symptoms of personality changes, and irritative motor condition. He explained that blood pressure can go to almost unattainable levels as a result of electric shock, and that this rise could account for the cerebral hemorrhage.

Dr. Oldberg, a neurosurgeon, testifying for defendant in error, based his opinion that there was no causal connection between the electric shock and the cerebral hemorrhage largely on the fact that decedent was able to work for 7 days, and then sustained what seemed to be an acute cerebral hemorrhage. He did admit that electricity can produce small hemorrhages in certain areas of the brain, which will not be disclosed by examination at the time of incidence, that an episode such as decedent sustained is likely to cause elevation of blood pressure, which could produce a hemorrhage.

Dr. George Coe, an internist, testified similarly that the death of the hypothetical individual was due to an acute massive cerebral hemorrhage, and that there was no causal connection between the electric shock and death. His opinion was based largely on the fact that there were no localized findings of any brain damage, either in its motor or sensory functions, between the time of the shock and the death. He emphasized that the electrical contact was momentary and did not render the individual unconscious, or knock him off his feet, and that he continued to work. The doctor admitted, however, that there can be a hemorrhage without focal signs or symptoms, and that it can become progressive and irreversible with symptoms appearing only when larger areas of the brain become involved. He also noted that decedent's hypertension, as indicated in the physical examination report, was very moderate.

Dr. Kearns, a coroner's pathologist, also stated in response to the hypothetical question that the shock did not contribute to death. He claimed that the current did not travel to the brain of the hypothetical person, but later

admitted that he could not be sure of the amount of current or resistance involved. He also contended initially that the electric shock would depress, rather than increase the blood pressure, but later conceded that it might increase the blood pressure, particularly in a hypertensive individual. He could not conceive of a cerebral hemorrhage resulting from electric shock without other symptoms, but recognized that a substantial period may elapse between the onset of a cerebral hemorrhage and death. The doctor also based his opinion on a misconstruction of one item of evidence. He stated that decedent's complaint of hearing the buzzing of the air compressor when it was not running was a symptom of his hypertension, whereas the evidence indicated that decedent complained that the air compressor was turned off, when in fact it was running.

On the basis of substantially the foregoing evidence, the Industrial Commission sustained the award of the arbitrator, ordering Inland Steel Company to pay decedent's widow death benefits under the Workmen's Compensation Act. On *certiorari,* the superior court of Cook County reversed that award on the ground that the decision was manifestly against the weight of the evidence.

In determining the propriety of that judgment, we must consider the record in the light of the principles defining the respective domains of the Industrial Commission and the reviewing court. The cases are replete with the rules that decisions of the Commission on questions of law, where the facts are not in dispute, are in no way binding upon the reviewing court (*Hill-Luthy Co.* v. *Industrial Com.* 411 Ill. 201; *Hydro-Line Mfg. Co.* v. *Industrial Com.* 15 Ill.2d 156), and that decisions of the Commission on disputed questions of fact should not be set aside unless they are manifestly against the weight of the evidence, regardless of how this court or the lower court might hold were it to hear the evidence. *Town of Cicero* v. *Industrial Com.* 404 Ill. 487; *Northwestern Barb Wire Co.* v. *Industrial*

*Com.* 353 Ill. 371; *Wilhelm* v. *Industrial Com.* 399 Ill. 80.

It is not apparent from the record which factual issues plaintiff in error failed to establish in the opinion of the superior court. Inasmuch as it is uncontroverted that decedent was engaged in his usual occupation on the company premises, and that the source of the alleged accidental injury was an instrumentality involved in decedent's regular work, there is no question that the alleged accident arose out of and in the course of his employment.

With reference to whether plaintiff in error established that decedent sustained an accidental injury, it is undisputed that while decedent and his helper were working on a forced air heater, decedent put his hand in the switch box to install a fuse and immediately "hollered" that the box was "hot," and jumped back some four feet. He was described as reacting in "a frightened manner like shock." Moreover, the assistant foreman corroborated that the fuse box was defective, and that anyone touching the fuse clips, which were live with current, would receive a shock. Although decedent replied that he was "all right" when the foreman asked him how he felt sometime afterward, the potential current of the switch box was sufficient to cause injury or death. In fact, defendant's medical witness, Dr. Kearns, acknowledged that the capacity of the switch box was 20 amperes greater than the amount of current required to produce death. From these facts and their reasonable inferences it cannot be seriously contended that plaintiff in error failed to establish that decedent sustained an accidental injury on November 5, 1954.

The only arguable issue in the record, which could conceivably be the basis for the reversal by the superior court, is whether there was a causal connection between this accidental injury and decedent's death a week later. We cannot agree with defendant in error that this is a question of law. Only when the undisputed facts are susceptible of but a single inference does the issue become one of law.

(*Henn* v. *Industrial Com.* 3 Ill.2d 325.) The fact that decedent said he was "all right" after the shock, and worked the following week, does not warrant disregarding all of plaintiff in error's medical evidence, as well as the direct proof of electrical contact and the bridging symptoms, testified to by decedent's wife. In our judgment, the issue of causal connection is essentially a medical question, on which two groups of medical experts reached opposite conclusions.

The law is well established that where the finding of the Industrial Commission depends upon the adoption of one of two highly conflicting views of medical experts, this court will not undertake to decide which of the two groups is more worthy of belief. The determination of where the preponderance lies is preeminently a function of the Industrial Commission, (*Electro-Motive Division* v. *Industrial Com.* 411 Ill. 224; *Grollemond* v. *Industrial Com.* 5 Ill.2d 541,) and it is not within the province of the superior court of Cook County on review (*Electro-Motive Division* v. *Industrial Com.* at p. 227,) or of this court, to reverse the findings of the Commission on medical questions, unless they are against the manifest weight of the evidence. *Grollemond* v. *Industrial Com.* 5 Ill.2d 541, 555-556; *Gump Co.* v. *Industrial Com.* 411 Ill. 196; *Laclede Steel Co.* v. *Industrial Com.* 6 Ill.2d 296.

In the instant case there was testimony of well qualified doctors that there could or might be a causal connection between the electric shock and the ensuing death of decedent a week later. The doctors explained the basis for their opinions, and the physiological phenomena involved. The electric current caused an increase in blood pressure which either ruptured or irritated the linings of the blood vessels of the brain, and this resulted in small hemorrhages that developed progressively into larger hemorrhages, culminating in a cerebral vascular insult, which was the immediate cause of death.

The doctors specifically found that death 6 or 7 days

following an electric jolt under the circumstances herein was consistent with a hemorrhage having its inception at the time of the jolt, and that the symptoms of headaches, personality changes, and tonic contractions were indicative of brain damage.

Those symptoms were largely ignored by the doctors testifying for the company. Moreover, much of their testimony supported the rationale of the doctors testifying for plaintiff in error. Defendant's doctors admitted that electric shock or jolt would increase blood pressure, although Dr. Kearns denied this initially. They also admitted that one can have small brain hemorrhages without focal signs or symptoms (as decedent apparently did, except for the symptoms noted by his wife) ; that such hemorrhages can become progressive and irreversible; and that symptoms appear as larger areas of the brain become involved. Moreover, while this group of experts found that decedent died of an acute massive cerebral hemorrhage, which was not caused by the electric shock, it was recognized that decedent's hypertension was very moderate, and consequently, not of the calibre that is likely to produce such an acute hemorrhage.

In the light of these medical facts, it was certainly reasonable for the Industrial Commission to have concluded that there was a causal connection between the accidental injury and the death of the decedent, and that finding can hardly be said to be against the manifest weight of the evidence.

It was therefore error for the superior court of Cook County to substitute its judgment as to which of the two groups of medical experts was more worthy of credence, and to set aside the award of the Industrial Commission on the ground that it was manifestly against the weight of the evidence. The judgment of the superior court is therefore reversed and the award of the Industrial Commission

in favor of plaintiff in error, Minnie Helen Helmke, for the death benefits under the Workmen's Compensation Act is reinstated.

*Judgment reversed; award sustained.*