(No. 53592.-)

DONALD P. GOURLEY, Appellant, v. THE INDUS-
TRIAL COMMISSION *et al.* (Interlake, Inc., Appel-
lee).

*Opinion filed March 18, 1981.*

Roger D. Lapan, of Bloomington, for appellant.

Jeremy P. Sackmann, of Seyfarth, Shaw, Fairweather
& Geraldson, of Chicago, for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion
of the court:

The sole issue in this case is whether an injury suffered
by an employee while playing basketball arose out of and
in the course of his employment within the meaning of
section 2 of the Workmen's Compensation Act (Ill. Rev.
Stat. 1975, ch. 48, par. 138.2) so as to entitle him to com-

pensation thereunder. The arbitrator and Industrial Commission held it did not, and that decision was confirmed by the circuit court of McLean County.

Claimant, Donald Gourley, was employed by respondent, Interlake, Inc., at its Pontiac plant. He was one of eight or nine individuals, including four or five Interlake employees, who played basketball on a team in a local industrial league composed of some six teams from local businesses. He had begun playing in 1971 when one of the Interlake plant foremen asked him whether he would like to play. He played each year thereafter, although not specifically invited to do so. He injured his knee during a game on December 16, 1976, and was off work for approximately seven months, during which surgical repairs were made to the knee. He received during this period 26 weekly payments of group insurance benefits in amounts of $100, and subsequently returned to work at respondent's plant.

Since the employer's connection with the team is crucial in determining the compensability of this injury, the details of that relationship are significant. The uniforms worn by the team were paid for by respondent and bore on the back the word "Interlake." "A couple" basketballs may have been purchased by the company, and it paid the league entry fee amounting to $125 to $175. These charges were paid from the company's community relations fund, as were contributions to the Pontiac Boy Scouts, Little League and Pontiac Boys Club of America. Undisclosed amounts were also used from this fund for employee bowling activities. The Pontiac daily paper carried box scores and stories about the league teams under the heading "Pontiac Area League." The team on which claimant played was identified in the league stories as "Interlake Steel." Team practice was held at Pontiac Central gym, and the company paid a nominal rental of $3 to $5 for each practice session. Notices regarding the

team could be put on the company bulletin board. Prior to the 1975-76 season all members of the basketball team had been Interlake employees, but apparently a lack of employee interest during that season made it necessary to recruit "outsiders" in order to field a team. On an earlier occasion the company's insurer may have paid for dental expense in connection with a basketball injury, but it is unclear whether, if made, the payment was from group health insurance or workmen's compensation coverage.

Neither games nor practice sessions were played on company property. Employees were not paid or given time off to practice or play, and games were always played at night or on Sunday. There were no admission charges for the games, although contributions would be solicited at half time to keep the league going. Attendance at the games consisted principally of friends and relatives of the players, players from other teams, and some school children. A former plant superintendent and his children had attended some games prior to his transfer, and the present manager of administrative services, including personnel, had attended some games when the league was first organized in 1970.

No particular recognition was accorded the team members by the company except in 1971-72, when they won the league championship in a game broadcast over the local radio station. On that occasion the company took the team members and their wives out for "dinner and drinks." Any trophies won were kept in a glass case in the main company cafeteria. The team was coached by an employee apparently chosen by the members; another employee served as coach when the regular one was absent. There is no evidence of company participation in these selections or any coaching decisions. Claimant agreed that no one had "twisted his arm" to get him to play, and there is no indication of any company official making any particular attempt to recruit players or influence

employees to become team members. The evidence established that Interlake is not engaged in the manufacture or distribution of consumer products; rather, its products are designed for and sold to industrial users.

Professor Larson, in his treatise (1A A. Larson, Workmen's Compensation sec. 22, at 5—71 (1979)), states that recreational activities are within the course of employment when:

> "(1) They occur on the premises during a lunch or recreation period as a regular incident of the employment; or
>
> (2) The employer, by expressly or impliedly requiring participation, or by making the activity part of the services of an employee, brings the activity within the orbit of the employment; or
>
> (3) The employer derives substantial direct benefit from the activity beyond the intangible value of improvement in employee health and morale that is common to all kinds of recreation and social life."

He notes that injuries may or may not be compensable depending on the differing "mix" found in the factual content:

> "Most of the same variables occur: on or off the premises and in or out of working hours; varying shades of employer initiative; differences in amount of employer contribution of money or equipment; differing quantities and types of employer benefit." 1A A. Larson, Workmen's Compensation sec. 22.24, at 5—106 (1979).

The relevant cases decided by this court consider the same factors. *Jewel Tea Co. v. Industrial Com.* (1955), 6 Ill. 2d 304, relied upon by claimant, involved an employee who was injuried during an intracompany-league softball game. The significant differences between the degree of company involvement in *Jewel* and here can best be demonstrated by reciting the facts of that case.

> "*** Kenneth Lejman, hereinafter referred to as plaintiff, sustained certain serious injuries while participating in a Jewel Tea Company league soft-

ball game. This league consisted of 15 teams, organized from among the employees of defendant's 153 stores in the Chicago area. The stores were divided in three divisions, each consisting of five districts, and teams were established in each district. The district teams played each other to establish a divisional champion, and ultimately the divisional champions competed to determine the league champion of the year. The divisional championship teams were awarded small trophies and the league champions were presented with larger trophies by the executives of the Jewel Tea Company at a special function. Each team was named in part after the district manager, and the team on which plaintiff played was known as 'Jeffrie's Gems,' since Paul Jeffreys was the district manager. He appointed the manager-captain of the team, who, in turn, selected the players from among the full-time employees in stores within the particular district. The company, since 1949, provided balls, bats, and T-shirts bearing the district team name on the front, and the emblem 'Jewel Food Stores' on the back. The employees furnished their own shoes, jackets, caps, and pants. There were no facilities for playing on company premises in most districts, and the games were held at public ball parks, with no admission charge or accommodations for the spectators, who were mostly friends and relatives of the players. No money was received by the team for playing, nor were they granted any time off from their work for practice.

After the teams were organized there was an annual dinner meeting, held on the company premises and paid for by the company, and attended by all the managers of the teams and the personnel chief of the company, at which the season

schedule was arranged and rules adopted for games among the Jewel teams. These scheduled games were the only games played by the teams, since the company discouraged the teams from joining the Industrial Soft Ball League. The former company personnel chief testified that the ball games were not used as any advertising media, but that it was part of the program of maintaining a good state of welfare that the athletic activities were encouraged. He stated, 'We felt that anything that drew Jewel people together in a social way promoted cooperation and furthered the joint effort of all of us.'

Information about the games was disseminated through a weekly company publication, *The Flash,* distributed to all employees, and also by announcements on the special program for Jewel Tea Company employees each morning on the company operated FM radio station, WMOR, which was listed in the newspaper. The championship game was further publicized by photographs and written accounts in the company's monthly publication, *The Crusader,* delivered to all employees.

With reference to the particular team on which plaintiff played, it appears that the district manager, Paul Jeffreys, who, as part of his duties, is charged with recommending promotions among employees in the district, designated Woody Woodruf, an employee in one of the stores in the district, to organize and run that team: Jeffreys also made up a schedule of games for the entire division. According to the evidence there was some difficulty in getting enough men out for the team, and Woodruf, on his day off, called upon the employees in the various stores in the district, during business hours, asking them to participate.

When Woodruf asked plaintiff, he replied, 'Not this year.' Whereupon Woodruf said, 'Why not? Don't you want to play any more? Haven't you any spirit?' Plaintiff stated that Woodruf 'made me feel like a fool, so I went out for the team.' " (6 Ill. 2d 305-07.)

In holding that the Commission had properly awarded compensation, this court, in *Jewel,* emphasized the degree of company support and encouragement given the teams, the benefit derived by the company through improved employer-employee relations, and development of an *esprit de corps* among the employees. Also viewed as significant was the subtle compulsion inherent in the identification with their teams of the district managers who recommended promotions.

Also relied upon by claimant are *Illinois Bell Telephone Co. v. Industrial Com.* (1975), 61 Ill. 2d 139, *Mid Central Tool Co. v. Industrial Com.* (1978), 72 Ill. 2d 569, *Lybrand, Ross Bros. & Montgomery v. Industrial Com.* (1967), 36 Ill. 2d 410, and *Anderson v. Poray, Inc.* (1963), 42 Ill. App. 2d 1. In each of those cases, however, the factual context in which the injury occurred differs markedly from that before us. *Illinois Bell* involved a large, intracompany league of 38 teams composed entirely of *Bell* employees; all costs of the league's operation were paid by the company; meetings were held on company premises and on company time; and the company newspaper carried news stories of the games and pictures of the players and trophies. Of significance, too, was claimant's testimony that his district superintendent had repeatedly talked to him regarding playing and asked him to join the team. *Mid Central Tool* is not truly apposite, for it involved an employer-financed Christmas party. The injured employee had been asked by the foreman, in a conversation at which the general foreman and company president apparently were present, to bring his wife to the party so

that they could talk to her about employment with the company. Similarly, *Lybrand, Ross* involved an award for the death of an employee on his way home from the company's annual golf outing at which both employees and firm partners, as well as clients, were in attendance. Attending employees were given paid time off while non-attending employees were required to work. This court, in upholding the award of compensation, emphasized the employer compulsion to attend the outing inherent in the fact that those who did not were required to work. The court indicated this subtle compulsion, also present in *Jewel* and *Illinois Bell,* distinguished the compensable from the noncompensable cases.

We do not believe the cases relied upon by claimant support his position, for they all involve substantially greater employer involvement and pressure to participate than is evident here. More nearly in point, in our opinion, are *Keystone Steel & Wire Co. v. Industrial Com.* (1968), 40 Ill. 2d 160, and *Minnesota Mining & Manufacturing Co. v. Industrial Com.* (1979), 78 Ill. 2d 182. In *Keystone,* despite an intracompany league much like that in *Jewel,* an award of compensation was reversed even though the degree of company involvement was substantially greater than here. Similarly, in *Minnesota Mining* a majority of this court, relying on *Keystone,* reversed an award of compensation under circumstances indicating significantly more company financing and support than is established by the evidence before us.

*Hendren v. Industrial Com.* (1960), 19 Ill. 2d 44, and *Hydro-Line Manufacturing Co. v. Industrial Com.* (1958), 15 Ill. 2d 156, are not particularly helpful. While in *Hendren* an employee who was injured while playing baseball on a company-sponsored team in an industrial league was awarded compensation, the court's concern appears to have been with the question of whether the shoulder injury actually resulted from the baseball activity. The

sketchy factual statement as to company involvement does, however, indicate company sponsorship, time off work to play, and company officer attendance at every game, a pattern of company support and participation significantly greater than that in the case before us. *Hydro-Line* is inapposite, for there the award was reversed because, while a company team was going to be organized, it had not been, and the employee was merely batting balls in a vacant lot next to the company property.

Nor are our recent opinions in *Board of Education v. Industrial Com.* (1980), 81 Ill. 2d 17, and *Eagle Discount Supermarket v. Industrial Com.* (1980), 82 Ill. 2d 331, helpful to claimant, for there awards were sustained because in *Board of Education* the teacher was injured in an on-premises practice volleyball game played with school equipment in preparation for a student-faculty game viewed as part of the school program, and in *Eagle* the injury suffered by an employee during a frisbee game constituted a known lunchtime activity on company premises in which the company acquiesced or, perhaps, participated.

We have detailed the factual settings of our earlier decisions in order to demonstrate why it is that we believe the evidence before us, whether measured by the standards of our earlier decisions or those delineated by Professor Larson, is insufficient to establish compensability. The activity here obviously did not occur on the premises as in *Eagle Discount* and *Board of Education* or as an incident of the employment as in *Lybrand, Ross.* The absence of the employer compulsion found in *Illinois Bell, Lybrand, Ross* and *Jewel* is demonstrated by the fact that so few employees were willing to play in this case that outsiders had to be utilized. And, considering the limited number of participating employees and that respondent's products are sold only to industrial users, it is difficult to find any direct benefit accruing to respondent from

improved employee health and morale or improved customer relationships.

Considering that the factual variations are infinite, it is apparent that no combination of words will so clearly demarcate the boundary line between compensability and noncompensability as to readily resolve every case. However, given the facts which here establish only minimal company financing, the absence of employer compulsion to join the team and the lack of any direct, substantial company benefit, the Commission's denial of compensation is surely not contrary to the manifest weight of the evidence. *United Airlines, Inc. v. Industrial Com.* (1980), 81 Ill. 2d 85.

The judgment of the circuit court of McLean County is accordingly affirmed.

*Judgment affirmed.*