DIANA K. FISCHER, a/k/a Diana K. Woods, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Signode Corporation, Appellee).

First District (Industrial Commission Division)   No. 1—85—2112WC

Opinion filed March 31, 1986.

Frank J. Wiedner and Richard J. Leamy, Jr., both of Wiedner & McAuliffe, Ltd., of Chicago, for appellant.

John P. Roddy, of Roddy, Power & Leahy, Ltd., of Chicago, for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Diana K. Fischer, is the widow of the decedent G. Gordon Fischer, and the mother and natural guardian of their four children. Decedent was an employee of respondent Signode Corporation. On June 19, 1976, decedent collapsed at a golf weekend sponsored by the Signode Management Association (SMA), and he subsequently died. Petitioner filed an application for adjustment of claim under the Workers' Compensation Act (Ill. Rev. Stat. 1975, ch. 48, par. 138.1 *et seq.*). The arbitrator denied compensation. On review, the Industrial Commission affirmed the decision of the arbitrator, and the circuit

court of Cook County confirmed the Commission's decision. On appeal, petitioner contends that Signode is sufficiently involved with the SMA and the golf outing so that decedent's illness constituted an injury arising out of and in the course of his employment.

The purpose of SMA included informing employees of Signode's current operations and future plans; allowing employees to increase their personal development by serving on SMA committees; and providing the employees with "added personal enjoyment, relaxation, and a change of pace," thereby offering "a means for key employees in various divisions to become better acquainted." SMA was directed by a management committee composed of Signode's vice-presidents. Signode's president approved the appointment of SMA's president. In addition to the management committee, SMA had a general program committee and four chapter program committees. Membership in SMA required that the employee be a "key individual who is recommended by a corporate officer and is approved by the management committee." There is no membership drive. Some people who are eligible choose not to become members.

Signode provided 75% of SMA's funding, and each member was required to contribute $25 annually in order to encourage attendance at SMA meetings. Signode had no control over how SMA used the money. SMA conducted a wide variety of activities, including seminars, chapter meetings covering industry-related topics, general meetings taking place during regular working hours, dinner dances, resort weekends, and a year-end meeting where corporate officers addressed Signode's future plans. The only solicitation for attendance at the social events was a "bulletin-type announcement."

Defendant attended the resort weekend in question at Burlingshire, Wisconsin, in June 1976. The bulletin announcing the weekend called it one of "fun and games" and emphasized "this is *your* outing, and we want to be certain that our plans include something for everyone who attends." No scheduled speeches or meetings were listed in the bulletin's list of activities. The employees paid half the cost of the weekend while Signode paid the other half. Decedent did not attend the Friday night dinner. Robert Dinsmore, past president of SMA who was in charge of the outing, testified that no speeches were given at the dinner. Edwin Wedley, an SMA member, testified that the SMA president welcomed everyone at dinner and that someone else said a few words about the weekend activities. Raymond Newhouse, another SMA member, testified that there was a speaker's table and that he thought someone gave a little speech about their distribution operation. No business meetings were held that weekend.

Dinsmore testified that 100 to 105 of the 330 eligible SMA members attended that weekend. Decedent arrived Saturday morning to play golf in a foursome which he had arranged. Before finishing the round, he collapsed and was taken to a hospital, where he was pronounced dead.

An SMA memorandum concerning a golf outing held in 1971 stated that the trip had provided "a frank response from the membership of SMA to the question of whether the organization was reaching the various objectives established for it." Guy Keefer, a member of SMA, stated that this was not the purpose of the 1976 golf outing. Keefer knew nothing about a general policy regarding the purpose of golf outings, and he disagreed with the statement in the 1971 memorandum. The 1971 memorandum attached a written summary of viewpoints expressed by employees at an SMA meeting. The viewpoints included a desire to explore the idea of giving a day off for three-day golf weekends in the future for those of supervisory rank as an earned privilege. The summary of comments depicted the weekend as an enjoyable occasion at which Signode managers gathered under relaxed conditions to discuss mutual problems and expand friendships. The summary also referred to the need of a better selling job being done to improve attendance. The summary also stated there were "two goals that seem to conflict, (a) the advancement of technical knowledge in a given area, and (b) the enlargement of friendships within the company for both business and personal advantage, [and] the second is more important."

Dr. Nathaniel Greenberg stated in his medical report that decedent suffered a fatal cardiac arrest, possibly secondary to a myocardial infarction which may have been precipitated by a business trip during the week, the Saturday morning drive to Wisconsin and carrying heavy golf clubs from the car to the golf cart. Dr. William B. Buckingham stated in his report that nothing in the record either established or refuted any of the possible causes of death. He noted that no autopsy was performed, and that death could have been caused by anything from peptic ulcers to a central nervous system vascular disease or to arsenic poisoning. Dr. Buckingham stated that the Wisconsin death certificate listed "coronary arrest" as the cause of death, but that he was unaware of the existence of such a cause of death. He concluded that there was "absolutely no relationship between the patient's work activities [during the week], his golf activities, and his ultimate death, whatever the cause might have been." Dr. Gerry A. Smyth also found no relationship between decedent's golfing and death. He stated that the "[s]udden death might have also occurred

even though he remained at home in bed *** ."

After a hearing, the arbitrator found that the SMA sponsored the golf outing in keeping with its goal to provide relaxation for the employees. No business functions were scheduled, and no business clients were allowed to attend. The arbitrator also found that attendance was purely voluntary, and that Signode did nothing to encourage attendance. The arbitrator concluded that petitioner had failed to prove that decedent's death was caused by an accident which arose out of and in the course of decedent's employment, and compensation was denied.

On review, the Commission found that SMA received 75% of its funding from Signode and 25% from members' dues. SMA management committee meetings were conducted during the working day, but members were not permitted to leave work early to attend outings, although there was testimony indicating that some employees did so. Signode's stationery was used by SMA for memoranda and invitations. Attendance was encouraged through the imposition of dues, but no coercion was exercised. The Commission concluded that the injury did not arise out of and in the course of decedent's employment.

The trial court stated that although the Commission made no finding regarding a causal connection, its finding that the injury did not arise out of or in the course of employment necessarily presupposed a finding of no causal connection. The trial court found that Signode did not derive a substantial business benefit from the SMA golf outing because there was not sufficient employer coercion, sponsorship or funding related to the event. The trial court concluded that the Commission's factual findings were not against the manifest weight of the evidence and that "[a]ccordingly, the death of the deceased did not arise out of or in the course of decedent's employment."

■ Although we focus extensively on the connection between the golf outing and decedent's employment, we initially note the importance of the causal connection between decedent's golfing and the cause of death. It is within the Commission's province to determine whether there is a causal connection between the injury and the employment, and to choose between conflicting medical evidence, and this issue of causation is implicit in the issue of whether the injury arose out of and in the course of employment. (*Weers v. Industrial Com.* (1984), 126 Ill. App. 3d 786, 467 N.E.2d 586.) In the present case, Dr. Greenberg found that decedent had suffered a fatal cardiac arrest which may have been precipitated by the work and golf activities. Dr. Buckingham and Dr. Smyth, however, found that the medical record failed to establish any specific cause of death and thus that no relationship could be established between the death and the work or

golf activities. We find that the Commission reasonably could have concluded from the medical evidence that no causal connection had been established.

■■ The other issue before us is whether the golf weekend was sufficiently connected to the employment to bring the activity within the course of employment. (*Minnesota Mining & Manufacturing Co. v. Industrial Com.* (1979), 78 Ill. 2d 182, 399 N.E.2d 612; see generally 1A A. Larson, Workmen's Compensation secs. 22.00-22.30 (1985). Compare Ill. Rev. Stat. 1983, ch. 48, par. 138.11, which now excludes voluntary recreational activities from coverage.) The inquiry in recreational activity cases typically focuses on whether the recreational activity itself arises out of and in the course of employment. *Minnesota Mining & Manufacturing Co. v. Industrial Com.* (1979), 78 Ill. 2d 182, 399 N.E.2d 612; *Rose v. Industrial Com.* (1981), 85 Ill. 2d 208, 421 N.E.2d 922.

Petitioner contends that the trial court used the wrong standard of review when it held that the Commission's finding that Signode did not receive a substantial benefit was not against the manifest weight of the evidence. The trial court found this was a fair and reasonable inference that the Commission could have drawn from the facts. Petitioner argues that the Commission's finding was a conclusion of law.

■■ ■ The individual facts of each recreational activity case must be carefully reviewed under three separate inquiries: to what extent the employer benefits from the employees' attendance at the outing; to what extent the employer actively organizes and runs the recreational event; and to what extent the employer sponsors and compels attendance at the event. (See, *e.g., Gourley v. Industrial Com.* (1981), 84 Ill. 2d 303, 418 N.E.2d 734; *Minnesota Mining & Manufacturing Co. v. Industrial Com.* (1979), 78 Ill. 2d 182, 399 N.E.2d 612.) Depending on the existence and weight of these factors, the Commission makes factual findings and reasonable inferences regarding the degree to which the athletic or social event is connected to the employment. If the Commission's factual findings and related inferences are not against the manifest weight of the evidence, it is reasonable to conclude as a matter of law that the employee's injury did not arise out of and in the course of employment. (*Keystone Steel & Wire Co. v. Industrial Com.* (1968), 40 Ill. 2d 160, 238 N.E.2d 593; *Jewel Tea Co. v. Industrial Com.* (1955), 6 Ill. 2d 304, 128 N.E.2d 699.) The Commission's findings of fact are not to be overturned by a reviewing court unless they are against the manifest weight of the evidence; however, decisions of law are not binding on the reviewing court. Only when the undisputed facts are susceptible to but a single infer-

ence does the issue become one of law. *Inland Steel Co. v. Industrial Com.* (1959), 18 Ill. 2d 70, 163 N.E.2d 489.

The first factor we examine is the benefits enjoyed by Signode as a result of decedent's participation in the golf weekend. The greater the benefits, the stronger the inference will be that the outing was work-connected. An economic benefit would be a strong indication of the employer's benefiting from employee participation. (See *Jewel Tea Co. v. Industrial Com.* (1955), 6 Ill. 2d 304, 128 N.E.2d 699 (employees wore T shirts with the company name printed on them while playing softball at public parks, thus advertising the company in a setting that would create good will).) Here, no economic benefit to Signode is apparent.

Another type of benefit is an improvement in employment relationships. This is often a weak indicator of the employer's involvement, because any social contact between workers can benefit working relationships, whether the social conduct is work-connected or not. The benefit in this case apparently included improved working and personal relationships, a goal of SMA. However, the connection between this intangible benefit and work is too tenuous for us to place reliance. (See, *e.g., Minnesota Mining & Manufacturing Co. v. Industrial Com.* (1979), 78 Ill. 2d 182,399 N.E.2d 612; *Keystone Steel & Wire Co. v. Industrial Com.* (1968), 40 Ill. 2d 160, 238 N.E.2d 593.) We agree with the arbitrator's finding that Signode derived no benefit from the golfing activity.

A second indicator of a work-connected recreational event is the employer's active involvement in the planning and running of the event. The inference is that if the employer finds the event requires its direct affirmative involvement, the event is more likely to be work-connected. In *Jewel Tea*, the softball games were arranged by the employer's district managers and personnel chief at a dinner meeting on Jewel property, where the schedule and rules were set. In contrast, Signode had some involvement in SMA, but the record reveals no active involvement by Signode in the planning and running of the golf weekend. Business-related speeches or meetings also indicate an affirmative, active involvement by the employer, in addition to indicating a benefit the employer receives. In the present case, the evidence conflicts as to whether speeches were given at the Friday dinner, but the weekend was purely social in nature. No business functions were scheduled.

Distinct from the employer's active involvement in planning and running the recreational event is a third factor—the employer's sponsorship of, as opposed to mere cooperation in allowing, the event.

Permitting time off from work at full pay is a strong indicator of employer support for the event. In the present case, the memorandum mentioned above refers to a day off, but there is no evidence the employees were given time off. The arbitrator found that Signode did nothing to encourage attendance at the outing. Attendance was voluntary, and business clients were not allowed to attend. Financial contribution is also an indicator of employer support. In *Minnesota Mining*, the employee club gave the softball league $400 and each member gave $10.50. The employer indirectly provided the club with substantial funds by giving the club all revenues from the canteens. Here, Signode paid for half the cost of the room, and the employees paid half the cost of the room plus all other costs. In addition, Signode provided 75% of the funding of SMA. As in *Minnesota Mining*, we find the financial support a factor to be considered in the whole picture, but not determinative by itself. We agree with the Commission's statement that the funding in SMA was "different in design, but not [in] effect from that of" *Minnesota Mining*, where the court denied compensation.

■ We conclude from reviewing the relevant factors under the circumstances presented in this case that it was not against the manifest weight of the evidence for the Commission to infer that Signode was not sufficiently involved in or supportive of the golf outing, did not compel participation or substantially benefit from employee participation, and that Signode did not step beyond merely encouraging attendance and cooperating with SMA. The Commission's decision that decedent's injury at the golf outing was not work-related is not against the manifest weight of the evidence.

For all the foregoing reasons, the judgment of the circuit court of Cook County confirming the decision of the Industrial Commission is affirmed.

Judgment affirmed.

WEBBER, P.J., and McCULLOUGH, BARRY and KASSERMAN, JJ., concur.