(No. 52277.—

IRVING O'DETTE, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Sears, Roebuck & Company, Appellee).

*Opinion filed March 21, 1980.*

Raymond Lannon, Ltd., of Chicago (Raymond L. Lannon and Patricia C. Lannon, of counsel), for appellant.

Rooks, Pitts, Fullagar & Poust, of Chicago (Daniel P. Socha, of counsel), for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

Irving O'Dette filed a claim under the Workmen's Compensation Act (Ill. Rev. Stat. 1975, ch. 48, par. 138.1 *et seq.*) for the total loss of vision in his left eye, which he said was caused by an accident that arose out of and in the course of his employment by Sears, Roebuck & Company (Sears). An arbitrator's award for permanent and total disability was reversed by the Industrial Commission, and its decision was confirmed by the circuit court of Lake County. The claimant has brought a direct appeal to this court under Rule 302(a). 73 Ill. 2d R. 302(a).

At the time of the claimed injury O'Dette, who had been employed by Sears for 13 years, worked in a warehouse where he inspected and repaired furniture. This work involved the lifting of tables and other pieces of furniture weighing between 25 and 700 pounds. Before he had been employed by Sears the claimant had lost the sight of his right eye as a result of an industrial injury.

On April 8, 1975, the claimant testified that, while lifting a 100-pound cocktail table from its carton, he suffered a disturbance in the left eye. He described this as a "black line, the size of a quarter. It looked like a half circle, with a little tail on it in the other direction, and it would not go away, and it felt kind of weird when it happened." This incident took place toward the end of the workday. The claimant did not report it to his foreman. He testified he spoke with Dr. Gerald Dominique, an opthamologist, about it that evening and was examined by him the next day. It appears that no particular treatment

was prescribed and the claimant returned to work two days later.

He testified that one month later, on May 13, while tipping a large pine dining-room table towards him, he felt a terrifying sensation in his left eye and that "all of a sudden" he could not see as well as before the incident. But, as on April 8, he made no report to his supervisor. The claimant testified that, though his vision was somewhat blurred, he managed to drive home.

The next day he again consulted Dr. Dominique, who referred him to two opthamologists specializing in retinal disorders, Dr. Harold Wilder and Dr. Charles Vygantas. They diagnosed the claimant's condition as a detached retina. In view of the extensive equatorial degeneration of his retina and the presence of numerous retinal tears, immediate surgery was recommended. Between May 20 and October 17, 1975, the claimant underwent five operations, which included four scleral buckling procedures and a vitrectomy in an attempt to correct the retinal detachment. The operations were unsuccessful. A report of Dr. Wilder dated March 10, 1977, stated:

> "All of these procedures proved not to be fruitful because the retina remains detached and the vision remains at a level of no light perception. It is our feeling that the patient has undergone unsuccessful surgery and this will probably be the permanent status of this left eye."

This appeal presents the question of whether the Commission's finding that the claimant did not suffer an injury arising out of and in the course of his employment on May May 13 was against the manifest weight of the evidence.

At the hearing before the arbitrator it was shown that the claimant had a history of medical problems involving the left eye. In 1971 surgery was required to remove a cataract. He later developed glaucoma, which had been treated with medication until the May 1975 incident. In May of 1974 the claimant was in an auto collision, and though he testified that this did not affect his eyesight, there was evidence which suggested that his vision became

blurred for a time immediately after the accident. He again complained of blurred vision in October of 1974 and received treatment for the condition.

The only medical witness at the arbitrator's hearing was Dr. Abraham Schultz, an opthamologist, who testified on behalf of the claimant. He said that though he had treated patients with detached retinas during his military service he now refers such cases to opthamologists specializing in this medical field. In response to a hypothetical question, Dr. Schultz stated that indirect trauma resulting from strenuous job activity could have caused the detached retina. When asked for the basis of his opinion, the witness said that he was relying upon the claimant's own testimony that he suffered a sudden loss of vision immediately after tipping the large pine table on May 13.

The record, however, shows there was other medical evidence later admitted before the Commission. In a report dated March 10, 1977, Dr. Wilder, who had operated on the claimant, said:

> "He also states that his heavy lifting during his job was the cause of his retinal detachment but I cannot see this being a causative factor. It is true that Mr. O'Dette had widespread equatorial retinal degeneration and this undoubtedly is the reason for the retinal detachment occurring on a spontaneous basis."

Dr. Vygantas, who also had performed surgery on the claimant, in a report stated that while "strenuous physical activity and straining have been the cause of retinal detachment," he could not say with any certainty whether there was such a causal connection in the claimant's case.

Too, Sears observes that though Drs. Schultz, Wilder and Vygantas generally agree that the detached retina was suffered in May of 1975, none of the medical records contain any reference to or a complaint by the claimant of a work-related injury. Though there is some suggestion that Sears was aware that the claimant was experiencing eye difficulties that might have been work related, it does not appear that the claimant filed any accident report

with Sears prior to filing his application for adjustment of claim with the Commission in August of 1975. He knew that making a report was a company rule when accidental injuries were sustained.

Sears also introduced into evidence a health insurance form which had been completed by Dr. Dominique. In response to a question on the form as to whether the claimant's injury arose out of his employment, Dr. Dominique responded "no." This form was signed by the claimant on September 2, 1975, though concededly at this time he was totally blind.

In a workmen's compensation proceeding the claimant has the burden of proving by a preponderance of the evidence the elements of his claim and, in particular, that his injury arose out of and in the course of his employment. (*Johnson Outboards v. Industrial Com.* (1979), 77 Ill. 2d 67; *Health & Hospitals Governing Com. v. Industrial Com.* (1975), 62 Ill. 2d 28.) It is the function of the Industrial Commission to decide questions of fact and causation (*Stewart Warner, Datafax Corp. v. Industrial Com.* (1979), 76 Ill. 2d 464; *County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10), to judge the credibility of witnesses (*Watts v. Industrial Com.* (1979), 77 Ill. 2d 30; *Sahara Coal Co. v. Industrial Com.* (1977), 66 Ill. 2d 353), and to resolve conflicting medical evidence (*Health & Hospitals Governing Com. v. Industrial Com.* (1979), 75 Ill. 2d 159; *Moore v. Industrial Com.* (1975), 60 Ill. 2d 197). Though a court might draw different inferences from the evidence, it is axiomatic that findings of the Industrial Commission will not be reversed unless they are against the manifest weight of the evidence. *Phelps v. Industrial Com.* (1979), 77 Ill. 2d 72.

Upon a review of the evidence we cannot say that the Commission's finding that the claimant's injury did not arise out of and in the course of employment is contrary to the manifest weight of the evidence. We affirm the judgment of the circuit court of Lake County.

*Judgment affirmed.*