CHICAGO TRANSIT AUTHORITY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Joshua Chism, Appellee).

First District (Industrial Commission Division)   No. 1—91—4085WC

Opinion filed October 30, 1992.—Rehearing denied December 29, 1992.

STOUDER, J., dissenting.

Bruce J. Talaga, of Chicago Transit Authority, of Chicago, for appellant.

Gaines & Gaines, of Chicago (Lewis P. Gaines, of counsel), for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

The employer, Chicago Transit Authority, appeals the circuit court's confirmation of the Industrial Commission's (Commission's) decision which held that claimant Joshua Chism was injured in the course of his employment and awarded benefits to claimant. We affirm.

The pertinent facts follow. Claimant, age 27, testified that he was employed as a bus driver for the employer in 1984. Prior to working for the employer, claimant, who had played basketball at Southern Illinois University for four years, played basketball at King Boys Club. On one occasion, claimant was approached by Arliss Jones, who told claimant that talented basketball players were hired by the employer as bus drivers. Subsequently, claimant was hired as a bus driver for the employer at the Kedzie Bus Station in Chicago.

Claimant further testified that the number of hours he worked each week depended on the number of games the team had. He played basketball on the employer's team when the season started in October of 1985. He apparently had quit the team for awhile in 1984 and rejoined it. According to claimant, he "practiced all year-round with the team." Sometimes games and practices were scheduled during work hours, when claimant was supposed to be driving a bus. Clark Carter, claimant's boss, told claimant that the superintendent would arrange for claimant to be off work during game time. Accommodation for the basketball team was the only time claimant's schedule was adjusted.

Claimant stated that the employer paid claimant for the days that he did not drive the bus and was instead playing basketball. When asked when this occurred, though claimant indicated it was more than once, he could not say how many times this occurred. He did testify that playing basketball was his "work assignment" and that there were times when he drove a bus less than he was required and got paid because he practiced. The uniforms the team wore were supplied by the employer and were given to the players at work. The employer paid for the uniforms, and the players travelled by bus to the game sites. Spectators at the games were charged admission, with the proceeds going to the employer's Welfare Fund, which supported basketball and other recreational activities.

Claimant testified that all of the team players were bus drivers for the employer, and the coaches were co-employees.

He further testified that before working for the employer, he spoke with Clark Carter, Ronald Coleman (who coached the team and whose actual name is Curtis Coleman, "Ronald" appearing to be a nickname) and Arliss Jones. According to claimant, Carter told him that because he was talented, he was being hired to play basketball. However, claimant did go through the routine hiring procedures with the employer's personnel department. Basketball was not mentioned. Claimant practiced basketball every morning in the summer of 1985 in a gym which the employer rented for its employees. Claimant was injured during a game on November 19, 1985.

Clark Carter, who was the superintendent of the Kedzie Bus Station in 1985, testified that the employer conducted a basketball league. Carter's role was to make time available for the employees to play in the league as manpower permitted and to adjust schedules accordingly. In 1985, Carter had 700 employees, 15 of whom played on the team. All of the players were bus drivers and they practiced at the Chicago Park District and the King Boys Club. Claimant was under Carter's supervision in 1985 and played on the team.

Carter could not recall giving claimant any specific route or hours so that claimant could play basketball in 1985, although Carter did recall that after claimant was injured playing basketball, claimant's name was placed in the Kedzie Garage sick book. The league was in existence by agreement of the union and the employer, and it was Arliss Jones' responsibility to schedule practices. Carter's role as superintendent included attending occasional games, and he attended award dinners and banquets for the basketball league.

Carter was present at the organizational meeting for the team, and bylaws were established. When an employee was injured during

league activity, the employee would go on the employer's "sick book." Carter, when asked how an injured employee's medical and hospital bills were paid, replied: "Whatever the insurance, they will compensate him in accordance with his injuries." He was asked which insurance paid for these expenses and stated: "I don't know. We have various carriers *** I do not know which one he would be with." When an employee was injured, he was to give the bills to "the medical department to the insurance. He would make a claim on a regular CTA claim form and give those bills to the CTA insurance company."

Carter's testimony was consistent with claimant's regarding the vending machine proceeds going to the Welfare Fund and the Welfare Fund funding the basketball league. There may have been a recruiting committee to enlist present employees in the sports leagues, and circulars advertising the leagues were sent out. Carter denied hiring claimant specifically for the purpose of claimant's participating in the basketball league.

William Beutoe, manager of the treasury of the employer, also testified. He was also the treasurer of the Welfare Fund and was in charge of the employer's monies and the control of the vending machines. He also testified that the vending machine proceeds go to the Welfare Fund, which funds the employer's sports leagues. Further, the Welfare Fund funded award dinners and banquets for the employer. The Welfare Fund funded 75% of the costs of the employer's sports programs and paid 75% of coordinators' fees. Fifty percent of the Welfare Fund's disbursements went to the employer's sports programs. The Welfare Fund also paid for uniforms and some equipment. The most the Welfare Fund has spent in one year is $40,000.

Arliss Jones, the employer's transportation program analyst, was the employer's sports coordinator in 1985. For his duties of coordinating sports in 1985, he was paid an additional $200 by the employer. He acknowledged that an employee on a team would go to the superintendent to have his bus hours rescheduled. Jones testified that he used the employer's office machines for sports league business. Jones denied having anything to do with hiring claimant and testified that employees joined the basketball team on a purely voluntary basis.

Curtis Coleman, the coach of the team for which claimant played, testified that claimant played on the team in 1985. According to Coleman, he gave the players schedules and collected $25 to $50 per player, which went towards the costs of the league. Coleman was at the game where claimant was injured. According to Coleman, claimant knew that his medical bills would be paid given that claimant was on duty at the time he was injured. Coleman was aware that individ-

uals injured in that manner were paid when off of work. Coleman denied having anything to do with hiring bus drivers in 1984 and 1985.

The arbitrator ruled that claimant was ineligible for benefits. The Commission, however, set aside that finding, ruling that claimant was in the course of his employment and awarded benefits (the extent of which is not at issue). Upon review, the circuit court confirmed the decision of the Commission.

The issue presented for review is whether the Commission's finding that claimant was injured in the course of his employment was against the manifest weight of the evidence.

■■ The governing statutory provision is section 11 of the Illinois Workers' Compensation Act (the Act) (Ill. Rev. Stat. 1985, ch. 48, par. 138.11), which provides:

"Accidental injuries incurred while participating in voluntary recreational programs including but not limited to athletic events, parties and picnics do not arise out of and in the course of the employment even though the employer pays some or all of the cost thereof. This exclusion shall not apply in the event that the injured employee was ordered or assigned by his employer to participate in the program."

As we observed in *Cary Fire Protection District v. Industrial Comm'n* (1991), 211 Ill. App. 3d 20, 25, 569 N.E.2d 1338, a case which addressed the same issue as that presented *sub judice*:

"The Commission's findings of fact are not to be set aside by a reviewing court unless contrary to the manifest weight of the evidence. [Citation.] Its determinations will not be set aside if they are supported by credible evidence in the record. [Citation.] Even though the facts are undisputed, where such facts permit more than one reasonable inference, then a question of fact is presented, and the conclusion of the Commission on the fact will not be disturbed by a reviewing court unless it is against the manifest weight of the evidence. [Citation.] A reviewing court will not overturn the Commission's findings simply because different inferences could be drawn, or otherwise substitute its judgment for that of the Commission. [Citation.]"

In the present case, it is clear that the employer funded many of the costs of the basketball league, the employer may have benefitted from claimant's participation in the league, and the employer actively organized and ran the league. Under section 11, however, such funding and organization are not sufficient, in and of themselves, to bring claimant's injury within the course of his employment.

In both *Kozak v. Industrial Comm'n* (1991), 219 Ill. App. 3d 629, 579 N.E.2d 921, and *Cary*, we held that the Commission's determination of whether the claimants were excluded under section 11 was not against the manifest weight of the evidence. In *Law Offices of William W. Schooley v. Industrial Comm'n* (1987), 151 Ill. App. 3d 1069, 503 N.E.2d 1186, we reversed the Commission's finding that the claimant was not in the course of his employment when injured while playing on his employer's softball team. We observed:

"Accidental injuries incurred by an employee while participating in a voluntary recreational program are excluded by section 11 \*\*\*. However, the exclusion does not apply if the employee was ordered or assigned to participate in the 'program.'" 151 Ill. App. 3d at 1074.

We believe the meaning of section 11 is clear that while voluntary participation in a recreational activity generally does not lend itself to the Act's benefits and protections, where an employee is ordered or assigned to participate in the activity, there exists an exception to the section 11 exclusion. In the case *sub judice*, while claimant's participation may have been voluntary in the sense that he wished to participate in the basketball league, there exists ample evidence in the record to support the Commission's determination that claimant was assigned to participate on the team.

The employer's witnesses, Carter, Jones and Coleman, testified to the effect that claimant's participation was voluntary and that he was not hired for the purpose of playing in the basketball league. Claimant, on the other hand, related that the employer's agents did hire him due, at least in part, to his basketball abilities and that the employer went to significant lengths to accommodate his basketball activities. He also said that at times basketball was his work assignment. Importantly, the employer does not dispute that if, indeed, its agents did expressly recruit and hire claimant to play basketball and accommodate his schedule to the lengths that claimant testified, claimant would fall within section 11's ordering or assigning exception. Rather, the employer's argument is that claimant's testimony is unworthy of belief.

While the employer does indicate some areas where claimant's testimony was inconsistent or impeached, it is well settled that it is the function of the Commission to judge the credibility of witnesses. (See *O'Dette v. Industrial Comm'n* (1980), 79 Ill. 2d 249, 253, 403 N.E.2d 221.) Given the Commission's resolution of the credibility issue, coupled with the obvious benefits to the employer and the regular and systematic organization the employer engaged, we hold that the

Commission's determination that claimant was assigned to play in the league was not against the manifest weight of the evidence, and claimant was excepted, therefore, from the section 11 exclusion.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McCULLOUGH, P.J., and WOODWARD and H. LEWIS, JJ., concur.

JUSTICE STOUDER, dissenting:

Respectfully, I must dissent.

I am troubled by the course the majority has taken in this case with its affirmation of the Commission's decision. It appears to me that the majority has given its blessing to the Commission's decision to ignore the plain language of the statute. The wording of the disputed statute in this case could not be more clear. Injuries incurred in the course of recreational activities are not compensable unless the employee was ordered or assigned by the employer to participate in the recreational activity. The majority initially engages in an irrelevant discussion on the funding of the basketball league by the CTA. The statute itself makes funding by the employer a nonissue.

The majority then goes on to say that the claimant was assigned to play basketball for the CTA. The majority's decision seems to imply that there is a difference between "ordering" and "assigning." I do not believe that there is an important difference between these two words; they both have the same implication—lack of voluntary behavior. The words seem to be interchangeable in describing an absence of voluntary participation. Support for this position is found in our previous decision *Cary Fire Protection District v. Industrial Comm'n* (1991), 211 Ill. App. 3d 20, 25, 569 N.E.2d 1338, 1342, wherein we stated "[i]t is undisputed that the claimant was not ordered to participate in the tournament; accordingly, his participation was voluntary." Similarly, in this case the claimant was not ordered to participate in the basketball league. This was a voluntary undertaking. Players had to try out for the league and win a spot on one of the teams; they were not ordered or assigned to do so. The CTA certainly accommodated the players by arranging their schedules so that they could play in the games, but this does not in any way show that participation was required of anyone.

I am troubled by the precedent we are setting with this decision. In my opinion, the majority's view does violence to the plain meaning

of section 11. If we are willing to ignore so flagrantly the express language of the statute, I am uncertain as to what meaning the statute will have after this decision. It appears to me that we have rendered section 11 meaningless. There is no rule of construction authorizing a court to declare that the legislature did not mean what the plain language of the statute imports. (*County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 485 N.E.2d 1076.) Because I believe the Commission's decision to award benefits to the claimant was patently in violation of section 11, I would reverse the circuit court's confirmation of the Commission's decision and reinstate the ruling of the arbitrator.

For the foregoing reasons, I dissent.