EDWARD HINES PRECISION COMPONENTS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Matthew Dearing, Appellee).

Second District (Illinois Workers' Compensation Commission Division)
No. 2—04—0608WC

Opinion filed March 24, 2005.

Michael F. Doerries, of Wiedner & McAuliffe, Ltd., of Chicago, for appellant.

Raymond M. Simard, of Raymond M. Simard, P.C., of Chicago, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Claimant, Matthew Dearing, filed an application for adjustment of claim against the employer, Edward Hines Precision Components, seeking benefits under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2000)). An arbitrator found that claimant's injuries did not arise out of the course of his employment. The Illinois Industrial Commission[1] (Commission) reversed the arbitrator's deci-

---

[1]Effective January 1, 2005, the name of the Industrial Commission was changed to the "Illinois Workers' Compensation Commission." However, because the Industrial Commission was named as such when the instant cause was originally filed, we will use this name for purposes of consistency.

sion and entered an award for claimant. The circuit court of Kane County confirmed the Commission. On appeal, the employer raises the issue of whether the Commission's finding that claimant's condition was caused by repetitive trauma in the course of his employment is against the manifest weight of the evidence. We affirm.

## FACTS

On June 6, 2001, claimant filed an application for adjustment of claim, stating that his upper extremities were injured due to repetitive trauma with a date of accident of May 14, 2001. On April 3, 2002, claimant filed another application, stating a date of injury of December 29, 2001. The applications were combined for arbitration.

At arbitration, claimant testified that prior to May 14, 2001, he had worked as a tractor/trailer driver for the employer for approximately five years. Claimant stated that he drove an 18-wheel, flatbed truck with a manual transmission an average of 200 miles a day. He shifted gears with his right arm and used his left arm to steer. Claimant delivered trusses that were secured to the flatbed with an average of 10 straps per load. The straps were tightened with either a manual wench or a pry bar. Claimant testified that tightening the strap required application of substantial force so that the load would not shift when the truck was moving. Claimant stated that some trailers were equipped with mounted wenches that required use of a pry bar approximately three feet long, weighing around 25 to 30 pounds. Claimant described and illustrated the act of tightening the straps. He testified that tightening the straps required more force than jacking up a car. According to claimant, in order to keep the load from moving, the straps would have to be tightened as much as possible. Claimant testified that he averaged two to four deliveries per day, and estimated that he tightened 35 to 40 straps per day. He stated he often would travel over rough roads and dirt roads to get to construction sites. Claimant testified that 9 out of 10 times he would stop between the yard and the construction site to resecure the load because it would loosen up. He submitted a series of photographs to illustrate. Claimant stated that he had an opportunity to view a videotape made by the employer in which the quality control manager illustrated the act of tightening the straps. Claimant criticized the videotape for failing to show the force necessary to secure a load. According to claimant, the tightening of a load as done in the employer's videotape would be insufficient to make travel safe on the roadway. Claimant also testified that in the videotape illustration, the quality control manager placed a ratchet in a reverse position where it would not even work.

Claimant testified that in late 2000 through the spring of 2001, he

began developing pain in his elbows that he had never experienced before. On May 14, 2001, claimant informed the employer's dispatcher, Bruce Janis, of his recurring pain and his desire to seek treatment. Janis advised claimant to seek medical treatment at Tyler Medical Services across the street from the truck yard. On May 14, 2001, claimant went to Tyler Medical Services and was prescribed medication and braces and an EMG was scheduled. After the EMG was reviewed, claimant was referred to Dr. Suchy, who prescribed braces and physical therapy. On July 24, 2001, claimant related continuing pain and Dr. Suchy recommended an injection and a second opinion. On August 14, 2001, claimant saw Dr. Thomas Atkins, who prescribed medication and an injection. On a visit of September 24, 2001, Dr. Atkins recommended surgery to the left wrist. Claimant testified that his condition worsened over the last half of 2001, but he continued to fulfill his job duties.

Claimant testified that on June 4, 2002, Dr. Atkins issued a work restriction to lift no more than 10 pounds; however, the employer was unable to accommodate that restriction. Claimant stated that he continued to work for the employer, but had constant pain in his wrists and elbows while working. He testified that although he had been prescribed braces for his arms, he was unable to wear them at work because they prevented him from fulfilling his job duties.

On cross-examination, claimant testified that the length of the flatbed trailers that he drove varied from 40 to 75 feet. Claimant stated that the law dictated that a strap be placed every four feet. He testified that the average number of straps per load was 10, but the actual amount of straps varied on the size of the load, not on the length of the trailer. Claimant was confronted with a photograph that apparently showed only three straps; however, claimant testified that the photograph showed only part of the trailer. Claimant stated that he used to smoke, but had not done so for nine years. He testified that his duties with the employer have changed and that now he is working as a truck driver/crane operator.

Jessie Albright, operations manager for the employer, testified that normally three to five straps are used to secure a load. Albright testified that he had observed the securing of loads on a daily basis for over a decade. On cross-examination, Albright admitted that he was not a truck driver and had never tied down a load. Albright testified that there are legal requirements for the amount of straps to be used, depending upon the length of the trailer. He stated that each trailer is supposed to have "X" straps for every so many feet of trailer, but that drivers do not put on as many as is required by law. Albright admitted that roof trusses have irregular shapes compared to other items, such

as rolls of plywood, but that something with an irregular shape did not necessarily require more straps.

Dr. Atkins testified that he first saw claimant on August 14, 2001, on the referral of Dr. Suchy. Claimant complained of numbness in both hands, with the numbness being worse in the left than the right, for a period of approximately two years. Upon review of an EMG dated June 29, 2001, Dr. Atkins concluded there was evidence of median nerve entrapment in the left wrist, consistent with mild carpal tunnel syndrome. Dr. Atkins prescribed Vioxx. On September 24, 2001, claimant returned, still complaining of significant symptoms, with numbness more on the left than the right. Dr. Atkins recommended open carpal tunnel release on the left side. On June 4, 2002, claimant returned still complaining of numbness in his fingers and stating that his symptoms were made worse by work activities. Dr. Atkins placed the restriction of lifting no more than 10 pounds. Dr. Atkins described claimant's purported job history:

"Q. [Attorney for the employer:] And what complaints did [claimant]—or what history did you obtain on June 4, 2002?

A. At that time[,] he was coming in for bilateral elbow pain. The numbness in his fingers was essentially unchanged from his last visit. His symptoms were made worse by activity.

Q. Did [claimant] describe any job activity to you?

A. [Claimant] described what he does at work including that he does a lot of gripping and pulling, more so at the time I saw him in June than he had previously been doing.

Q. Did [claimant] describe to you this gripping and pulling activity that he did?

A. Yes.

Q. And what—how did [claimant] explain it to you?

A. [Claimant] described tightening belts down that helps secure a load on his truck using, I think they call it, a pry bar.

Q. And did [claimant] demonstrate to you how he did it?

A. He may have. I'm not—I don't recall for sure.

Q. Okay. But did [claimant]—he told you on June 4th of 2002 that he was doing more of that gripping and pulling than previously?

A. Yes."

Dr. Atkins rendered an opinion regarding causation. Dr. Atkins testified:

"Q. [Attorney for claimant:] *** Doctor, for the purposes of the following questions[,] I want you to assume that [claimant] tightens approximately 40, sometimes more, sometimes less, straps per day as described in those eight photographs, in addition to driving an 18-wheel truck approximately 100 miles per day, more than half of

it in—in the city. His truck has seven or nine forward gears and he's required to drive with his left hand and shift with his right hand, and each of those activities require[s] him to keep the elbow in a steady flexed position.

Doctor, knowing all that and based on your examinations and your review of the diagnostic tests, do you have an opinion, based upon a reasonable degree of medical and surgical certainty, as to whether or not there is a causal connection of ill-being which you found in the wrists and elbows of [claimant]? And let me add that he's performed this work activity for approximately five to six years before you first saw him.

\*\*\*

A. I think that his tasks as demonstrated here can certainly contribute to his carpal tunnel syndrom and medial epicondylitis.

Q. Can you explain your opinion, Doctor?

A. Repetitive, forceful gripping demonstrated here of the assumed number of times per day can contribute to carpal tunnel syndrome and medial epicondylitis."

Dr. Atkins testified that there was no indication that claimant was suffering from diabetes or a thyroid condition that would have contributed to the carpal tunnel syndrome.

Q. [Attorney for claimant:] \*\*\* The treatment—is there a causal—do you have an opinion, based upon a reasonable degree of medical and surgical certainty, as to whether or not there's a causal connection between the work activity as described and the need for surgery in the left wrist?

A. I believe that the work activity can contribute to his problem which can require surgery.

Q. Do you have an opinion as to whether or not it's more likely than not that the work activity contributed to the carpal tunnel syndrome and the medial epicondylitis?

A. Yes. I believe it's more likely than not that it contributed.

Q. And that opinion is based upon a reasonable degree of medical and surgical certainty?

A. Yes."

On cross-examination, Dr. Atkins admitted that both carpal tunnel syndrome and medial epicondylitis can develop without repetitive trauma. He testified that, in this case, both the frequency and amount of force used in performing the activities contributed to his conclusion of causation.

Dr. Michael Vender, a hand surgeon, was retained by the employer to examine claimant. Dr. Vender's examination included a review of a videotape and written job analysis. Dr. Vender did not notice any muscle wasting or atrophy in either the forearms or the hands. A

review of an EMG dated October 19, 2001, revealed findings consistent with carpal tunnel syndrome on the left side, whereas on the right side the indications were borderline right carpal tunnel syndrome without a definitive diagnosis. Dr. Vender had a diagnosis of carpal tunnel syndrome left greater than right. Dr. Vender was of the opinion that claimant could continue to perform his work activities, as there was no reason he would need restrictions based upon mild carpal tunnel syndrome and also because he had continued to perform his work activities. Dr. Vender testified that surgical intervention could be considered relative to claimant's complaints about his left wrist. He was of the opinion, however, that there was no causal relationship between claimant's work activities and the development of carpal tunnel syndrome.

Dr. Vender stated that he based his opinion on the fact that claimant did not perform the tasks persistently. He believed that the forceful activities performed by claimant were of a more "intermittent exertional nature and would not be persistently performed during the workday." Dr. Vender testified that his opinion was based upon the videotape and written job analysis:

"Q. [Attorney for the employer:] Reviewing your December 19, 2001[,] report marked [the employer's] Deposition Exhibit No. 4 for identification, what pertinent information did you find in the written job analysis and the videotape?

A. I think most important was the job analysis on the videotape. That is, in it showed what would be considered forceful activities, such as cinching down straps or buckles, and how this was performed.

It also demonstrated that as force was required, rather than doing it by hand, a bar was utilized to get better leverage, which is a protective mechanism, so there was an ergonomic aspect to this.

And it coincided or substantiated what my initial impressions were, that were activities of a forceful nature.

However, these were not performed regularly. This would be more of an intermittent exposure rather than a regular exposure."

Dr. Vender testified that the fact that the tasks were performed intermittently allowed claimant a recovery or rest period. On cross-examination, Dr. Vender stated that the other possible causes of claimant's carpal tunnel were his being overweight and having been a smoker.

The arbitrator found that claimant had failed to prove a causal relation between his condition and his employment activities. He concluded:

"[Claimant] failed to establish that his employment tasks are repetitive so as to cause bilateral carpal tunnel syndrome and

medial epicondylitis. [Claimant] spends 90% of his shift operating a truck equipped with a manual transmission and power steering. There was no evidence of any malfunction or defect in the truck creating excessive vibration. Also, he uses his right hand to shift gears. If this activity were a cause of his symptoms, it is reasonable to infer the carpal tunnel syndrome would be worse on the right than on the left. Second, [claimant] only ties down loads 5 to 15 minutes, using 3 to 12 straps, each shift. While this activity requires force, it does not require persistent repetitive force. Thus, by definition this activity is not repetitive. Third, Dr. Atkins assumed [claimant] tied down 40 straps each shift, a fact not in evidence. The [a]rbitrator notes that Dr. Vender appears to have had a more detailed and accurate understanding of the [claimant's] job activities than did Dr. Atkins, thus, the [a]rbitrator adopts the testimony of Dr. Vender in determining the issue of compensability."

The Commission reversed the decision of the arbitrator and found: "Based upon the credible testimony of [claimant], the opinions of Dr. Atkins, the medical records[,] and the sequence of events[,] the Commission finds a causal relationship exists between [claimant's] repetitive work and the development of bilateral carpal tunnel syndrome which manifested itself on May 14, 2001. Dr. Atkins testified that [claimant's] work tasks could certainly contribute to [claimant's] carpal tunnel syndrome. While Dr. Vender testified that there was no causal relationship[,] he could not say what caused [claimant's] condition and conceded [claimant's] job required forceful use of his hands. Dr. Vender placed part of the blame on [claimant's] history of smoking. However, [claimant] testified he had not smoked in nine years. The Commission finds the opinions of Dr. Atkins, the treater, to be more credible than the opinions of Dr. Vender. Dr. Delis' medical record for May 14, 2001[,] noted [claimant] began noticing sore pain in the bilateral wrists with his normal job responsibilities. The Commission finds that [claimant's] symptoms arose while he performed his duties on behalf of [the employer]."

Claimant was awarded medical expenses and the employer was ordered to authorize the surgery prescribed by Dr. Atkins. 820 ILCS 305/8(a) (West 2000). The employer timely appealed.

## ANALYSIS

The employer contends that claimant failed to prove he suffered repetitive trauma from work. The employer asserts that claimant spent less than 10%, and probably closer to 2%, of his workday tying down loads.

■ There is no legal requirement that a certain percentage of the workday be spent on a task in order to support a finding of repetitive

trauma. The Commission often categorizes compensable injuries into two types—those arising from a single identifiable event and those caused by repetitive trauma. See *Peoria County Belwood Nursing Home v. Industrial Comm'n*, 115 Ill. 2d 524, 530, 505 N.E.2d 1026, 1028 (1987). An employee who alleges injury from repetitive trauma must still meet the same standard of proof as other claimants alleging accidental injury. *Three "D" Discount Store v. Industrial Comm'n*, 198 Ill. App. 3d 43, 47, 556 N.E.2d 261, 264 (1989). The employee must still show that the injury is work related and not the result of a normal degenerative aging process. *Gilster Mary Lee Corp. v. Industrial Comm'n*, 326 Ill. App. 3d 177, 182, 759 N.E.2d 979, 983 (2001).

■ The phrase "repetitive trauma" was developed in order to establish a date of accidental injury for purposes of determining when limitations statutes, and notice requirements, begin to run. See *Belwood Nursing Home*, 115 Ill. 2d at 530-31, 505 N.E.2d at 1028-29. The date of injury in repetitive trauma cases is the date on which the injury manifests itself, meaning the date on which the fact of injury and the causal relation to work would have become plainly apparent to a reasonable person. *Three "D" Discount Store*, 198 Ill. App. 3d at 47, 556 N.E.2d at 264. The categorization of an injury as due to repetitive trauma and the corresponding establishment of an injury date are necessary to fulfill the purpose of the Act to compensate workers who have been injured as a result of their employment. *Belwood Nursing Home*, 115 Ill. 2d at 530-31, 505 N.E.2d at 1028-29. The recognition of such a date allows an employee to be compensated for injuries that develop gradually, without requiring the employee to push his body to a precise moment of collapse. *Castaneda v. Industrial Comm'n*, 231 Ill. App. 3d 734, 737, 596 N.E.2d 1281, 1284 (1992). There is no requirement that a certain percentage of time be spent on a task in order for the duties to meet a legal definition of "repetitive."

The issue at hand is causation. The question before the Commission was whether the job activity was repeated sufficiently to cause the injury. Accordingly, both parties' arguments regarding the Commission's use of the phrase "cumulative trauma" are misplaced. The Commission unequivocally found that claimant's employment was a causative factor in his condition of ill-being. The use, or nonuse, of the terms "repetitive trauma" and "cumulative trauma" by the Commission is irrelevant because the dates of manifestation were not questioned. The employer does not question the manifestation dates and a glance at the record reveals that claimant's alleged dates of manifestation reasonably correlate to his medical treatment. The repetitious nature of the tasks performed by claimant is relevant only to the question whether the tasks caused claimant's condition. Causa-

tion is at issue, and the Commission found that claimant's employment caused his condition. See *Fierke v. Industrial Comm'n*, 309 Ill. App. 3d 1037, 1040, 723 N.E.2d 846, 850 (2000)

The employer presented testimony from Dr. Vender to support its position. Dr. Vender conceded that claimant had carpal tunnel syndrome that was stronger on the left than on the right. Dr. Vender, however, attacked claimant's assertion that his employment was the cause, specifically his strapping in loads. Dr. Vender testified that the strapping in of loads was only a small portion of claimant's workday and that the task was not persistent, as claimant had time between loads to rest his body such that there would be no permanent effect.

Claimant raises several questions about Dr. Vender's testimony. First, claimant points out that Dr. Vender based his opinion, at least in part, on the employer's videotape of the job, which claimant criticized for showing improper technique and not showing the force needed to secure a strap. Dr. Vender relied on the employer's written job description for the amount of straps secured by claimant. Furthermore, claimant raised questions as to whether his body was truly resting while driving loads after securing straps.

Finally, as the Commission pointed out, Dr. Vender's alternative explanations for claimant's condition appear suspect. Although the employer argued before the Commission that claimant's condition was caused by his working with horses, Dr. Vender never testified about other manual activities by claimant, and there is no indication that such activities were significant enough to contribute to claimant's condition. See *Fierke*, 309 Ill. App. 3d at 1040, 723 N.E.2d at 851. Dr. Vender testified that claimant's weight and his being a smoker were alternative causes. Claimant was 5 feet 9 inches tall and weighed 220 pounds. Dr. Vender admitted, however, that weight is not an absolute factor. Dr. Vender's other proposed cause, smoking, is even more questionable given that claimant testified he had not smoked for nine years.

Claimant relies on the testimony of Dr. Atkins, which supports a finding of causation. The employer contends that there was a lack of proper foundation for Dr. Atkins' opinion, arguing that "the claimant never described any employment tasks as a cause of his symptoms" and that "Dr. Atkins was not provided with any depiction or description of the claimant's employment tasks during his medical examinations." However, Dr. Atkins testified that during the course of treatment, claimant gave a description of strapping down a load, as shown by the quoted testimony regarding the June 4, 2002, visit. The employer also contends that Dr. Atkins' testimony lacks proper foundation because he was not provided with the videotape job analysis made

by the employer. Nonetheless, the Commission was presented with testimony disparaging the videotape, and Dr. Atkins did review the still photographs created by claimant.

The employer points out that Dr. Atkins was asked to assume that claimant "tightens approximately 40, sometimes more, sometimes less, straps per day as described in those eight photographs." The employer asserts that "there is simply no credible lay testimony to suggest that claimant tightened down 40 straps per shift." This ignores claimant's estimate that he tightened 35 to 40 straps per day and often stopped in route of delivery to check on and retighten the straps. The employer presented opposing testimony from its operations manager, but the Commission was entitled to evaluate the differing estimates. Furthermore, Dr. Atkins ruled out other causes for claimant's condition, such as diabetes and thyroid problems. Claimant laid a proper foundation for Dr. Atkins' opinion and the Commission was free to accept this testimony. See *Electro-Motive Division, General Motors Corp. v. Industrial Comm'n*, 240 Ill. App. 3d 768, 774-75, 608 N.E.2d 162, 163-164 (1992) (Commission is free to give more weight to testimony of a treating physician).

■ The resolution of this case was essentially based on the Commission's evaluation of the credibility of witnesses. In resolving questions of fact, it is within the province of the Commission to resolve conflicts in the evidence, draw reasonable inferences from the evidence, and assess the credibility of the witnesses. *Kirkwood v. Industrial Comm'n*, 84 Ill. 2d 14, 20, 416 N.E.2d 1078, 1080 (1981).

A finding of fact by the Commission will be set aside only if it is against the manifest weight of the evidence. *Inter-City Products Corp. v. Industrial Comm'n*, 326 Ill. App. 3d 185, 193-94, 759 N.E.2d 952, 959 (2001). The Commission has the function of deciding questions of fact, judging credibility of witnesses, and resolving conflicting evidence, including medical evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221, 223 (1980). In order for a finding of fact to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894, 896 (1992). In this case, the Commission's finding of causation was not against the manifest weight of the evidence.

Accordingly, the order of the circuit court confirming and adopting the decision of the Commission is affirmed.

Affirmed.

McCULLOUGH, P.J., and HOFFMAN, CALLUM and HOLDRIDGE, JJ., concur.