PINCKNEYVILLE COMMUNITY HOSPITAL, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Mary Downen, Appellee).

Fifth District   No. 5—05—0204

Opinion filed March 30, 2006.

James R. Clune, of Garofalo, Schreiber, Hart & Storm, Chtrd., of Chicago, for appellant.

Charles Cavaness, of Womick Law Firm, Chtrd., of Herrin, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Claimant, Mary Downen, sought benefits pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2004)) for injuries allegedly sustained in the course of her employment for Pinckneyville Community Hospital, the employer. The arbitrator found that claimant failed to prove she had sustained accidental injuries arising out of and in the course of her employment. See 820 ILCS 305/19(b) (West 2004). On review, the Illinois Industrial Commission (Commission)[1] reversed the decision of the arbitrator and awarded claimant benefits for temporary total disability (TTD), total permanent disability, and medical expenses. The circuit court of Perry County confirmed the decision of the Commission.

On appeal, the employer raises these issues: (1) whether the Commission erred in finding that an accident occurred which arose out of and in the course of claimant's employment and (2) whether the finding of causation by the Commission was in error. We affirm.

## FACTS

Claimant suffered an intracerebral hemorrhage and stroke while giving a speech at a dinner. Claimant had been a nurse at Pinckneyville Community Hospital for 25 years. For more than a decade, she had served as the director of nurses. Her speech was to honor a retiring physician.

Claimant described her job duties. She testified that unless there was an unusual workload, her typical work schedule was from 6:30 a.m. to 4:30 p.m., Monday through Friday. She stated that she would go to work on Saturday to catch up with her chores or help in the emergency room if it was short on personnel. Claimant testified that she often stayed late in the evenings. She also stated that a couple times a month, she would stay until 2 or 3 in the morning if the staffing was short or there was an overload of patients.

As a part of her job duties as supervisor, claimant was responsible for contacting other nurses to fill in for sick nurses and if no one was available, she would do the work herself. Claimant testified she typically received two or three phone calls a day at home for work problems. She stated that she took off a week in November 1997 for vacation, but other than a day or two at a time to work at home, she had not taken a vacation for six years before that.

Claimant began her tenure as the director of nurses in 1986. In

---

[1]Effective January 1, 2005, the name of the Industrial Commission was changed to the "Illinois Workers' Compensation Commission." However, because the Industrial Commission was named as such when the instant cause was originally filed, we will use this name for purposes of consistency.

1997 John Schubert became the administrative chief executive officer (CEO) for the employer and instituted changes. Schubert decided that the hospital should undergo a new accreditation and wanted claimant to coordinate the process. He formed a committee known as Administrative Team Members, or ATM. Claimant became responsible for five more departments when Schubert set up the ATM committee. After several months, Schubert switched claimant to a salaried pay, which decreased claimant's income. The number of telephone calls from work that claimant received at home increased, and she would have to return to work at least once a week.

In 1998, Dr. Cawvey, a longtime member of the hospital staff, retired. Claimant and two other nurses made arrangements for a retirement dinner to be held at Red Hawk Country Club in Pinckneyville. The evening began with an open house for the public that lasted two hours. At approximately 6 p.m., the dinner commenced with just the board, the medical staff, the ATM, and their guests. The board approved a certain amount for the costs associated with the dinner.

Claimant testified that prior to Schubert becoming chief of staff, she had experienced occasional headaches and back and neck pain, accompanied by trouble sleeping. She stated that after Schubert became administrator, her problems with headaches and sleeplessness increased. Claimant testified that she also became short-tempered.

Claimant testified that she was nervous about her speech because it was being given on short notice and she wanted to be sure that she said everything "just right." She described how she came to give the speech:

"Q. [Attorney for claimant:] Can you tell us how that came about that you gave a speech or were going to give one of the speeches?

A. Well, we were having the ATM meeting on Thursdays then, and on that Thursday, Mr. Schubert said, [']I think[']—

* * *

Mr. Schubert said, [']I think someone from the committee should give a speech.['] And one of the other ones, I don't know for sure who, said, [']Well, Mary should do that because she's the nursing director.['] And, see, I had worked longest with Dr. Cawvey, and he said that he thinks that would be appropriate as the director of nurses.

Q. Who is he?

A. Oh, Mr. Schubert said that.

* * *

Q. You said you didn't want to give the speech. I asked you why you didn't want to give the speech?

A. Well, I don't like to speak in public, anyway, and it was short

notice, and I just felt like I didn't have time to work on anything decent, and I felt like he was expecting me to not do well.

\* \* \*

Q. From your standpoint, from your perception, what was different about talking at the retirement dinner, as opposed to these nursing meetings?

A. Well, at the nurse's meetings and those classes, they were—I was responsible for that. It was my job, and they were all, I don't know, is [']subordinate['] the right word? They were all less than me, as far as status. I was their boss.

And so with the—with the speech for Mr. Cawvey, it was all medical staff and board members and their husbands—and their spouses, so it was like a higher level that I was talking to, and that's all."

When claimant stood up to give her speech, her head hurt and she heard a roaring sound in her ears. About halfway through the speech, she lost sight in one of her eyes and then lost consciousness.

John Schubert testified that he was the administrative CEO for the employer at the time of the incident. He testified that once it had been decided there would be a retirement dinner for Dr. Cawvey, he handed the planning over to a nurse named Norma Gordon. Schubert testified that he did not create the agenda or order anyone to speak at the event, and he did not direct or require any employees to attend the event.

Dr. Fozard, the claimant's family physician, personally witnessed the incident. Dr. Fozard testified:

"Q. [Attorney for claimant:] What sort of history did you acquire from [claimant]?

A. Well, actually, I was at a meeting that [claimant] was at on that evening, a retirement dinner for my senior partner. And [claimant] was in the process of giving a speech, and she had a headache before the speech started, and the headache got progressively worse during the speech.

[Claimant] was unable to continue the speech, got light-headed, nauseated, [and] actually threw up a large amount at the dinner.

And we called an ambulance and I rode with [claimant] in the ambulance to the hospital. I treated [claimant] in the emergency room, did a CAT scan, [and] determined that [claimant] had a pretty good sized intracranial bleed and her blood pressure was high at this time."

Dr. Fozard testified that he corresponded with St. Louis University Hospital during claimant's stay there and that he was of the understanding that claimant had suffered a devastating stroke in the area of the brain stem.

Dr. Fozard had been chief of staff until 1997 and had conversations with claimant on a daily basis at the hospital. He described the details of claimant's job. Dr. Fozard stated that claimant was under considerable stress in her employment as the director of nursing. He testified that claimant had no assistant or clerical help. Dr. Fozard testified that claimant was constantly retraining nurses because the employer's pay scale was historically low.

Dr. Fozard had the opinion that claimant's speech was a part of her job duties. He was of the impression that claimant was speaking in her capacity as the director of nursing, reflecting back over Dr. Cawvey's entire career and the changes that had occurred at the hospital. Dr. Fozard testified that "to the best of his knowledge," it was Schubert who had asked claimant to give the speech. Dr. Fozard observed claimant's anxiety leading up to the speech. He testified:

> "Well, there was no doubt that [claimant] was under stress trying to give that speech, because she was very nervous, and I sat at a table with her. And she was quite nervous about giving the speech and being in front of the crowd."

Dr. Fozard was of the opinion that the stress of her job duties and the stress of giving the speech caused the claimant's hemorrhage. Dr. Fozard testified:

> "A. And we also[—]the administrator was trying to get accreditation for the joint commission started. We had not been accredited for six or seven years, and he came in and decided it should happen that year. That was discussed at medical staff, and [claimant] was told that she would have to get all the policies—
>
> * * *
>
> I actually happened to be in the meeting when that was said, for your information. [Claimant] was told that she had to get all the policies up-to-date. And that was going to require a lot of work.
>
> [Claimant] asked for help, which she did not get. So quite a bit of stress [was] going on in her life.
>
> Then, going to this program on the night of the 22nd, public speaking wasn't one of the things [claimant] liked to do, but [claimant] was required to get up in front of the crowd and say something about Dr. [Cawvey's] retirement.
>
> I think all that together put too much pressure on a weak blood vessel in [claimant's] brain.
>
> Q. [Attorney for claimant:] And what happened then?
>
> A. I think that's when the bleeding occurred.
>
> Q. Is that opinion within a reasonable degree of medical certainty?
>
> A. Yes."

Dr. Schreiber, a neurologist, had reviewed medical records on claimant's behalf. He testified that claimant suffered a pontine intracerebral hemorrhage:

"Q. [Attorney for claimant:] When you were talking about the job stressors[,] what were you specifically talking about?

A. Well[,] [claimant] was put under pressure of doing a whole lot more work, having less time, having stresses, having less help from what I understand[,] and [claimant] had to give a talk[,] and from what I understand Dr. Fozard knew her quite well[,] and she became acutely anxious[,] and of course[,] that can elevate your systolic blood pressure[,] and that is what happened to [claimant][—]she developed an acute elevation of the blood pressure that lead [sic] to this hemorrhage.

Q. When would the acute elevation of the blood pressure[—]when would that have occurred[,] approximately when?

A. Shortly before the hemorrhage.

Q. Are you talking about during the speech?

A. During the speech[,] shortly before the speech[,] yes.

Q. In your opinion[,] within a reasonable degree of medical certainty[,] did the stresses associated with the speech either cause or contribute to cause the intracerebral hemorrhage [claimant] suffered?

A. Caused it[.] [Claimant] has ongoing problems[,] but an acute elevation of blood pressure related to stress is very well known caused [sic] this hemorrhage."

Dr. Schreiber was critical of the suggestion that the hemorrhage was not related to the speech. He specifically attacked the opinion of Dr. Barnhart, one of the employer's experts:

"Q. [Attorney for claimant:] Do you agree with the opinions expressed in that?

A. Well, I think that Dr. Barnhart does state that chronic hypertension does cause blood vessel abnormalities, that I agree with. I think that the question becomes hemorrhage[.] I think the hemorrhage is related to acute systolic hypertension[—]this is a hemorrhage, this is not a stroke, a stroke of thrombosis or blood vessel closing off[,] this is not related to chronic hypertension[,] this is acute hypertension[,] and I disagree with him[;] I think this is absolutely related to the event of giving the speech and the acute systolic hypertension."

Dr. Barnhart, an internist, had reviewed claimant's medical records at the request of the employer's insurance carrier. Dr. Barnhart was of the opinion that claimant's intracerebral hemorrhage was more likely than not due to essential hypertension. He described essential hypertension as idiopathic, meaning that the medical com-

munity does not know what causes it. Dr. Barnhart stated that records from a pregnancy in 1975 and from an incident of pneumonia in 1990 indicated claimant had elevated blood pressure. He was of the opinion that claimant had essential hypertension that had been untreated for years, if not decades, prior to her stroke.

Dr. Barnhart testified that there is no evidence to suggest that hypertension is somehow related to chronically stressful situations. He explained that a public speaking engagement would not have elevated claimant's blood pressure to the extent of causing an intracerebral hemorrhage, in that her condition was a natural progression. Dr. Barnhart also stated that the theory of flight or fight, from a clinical perspective, had little support. He testified:

"There is always theory of the flight and fight, that if somebody scares you, your blood pressure goes up. Actually from a clinical perspective, there is little[,] if any[,] data to support that, and it certainly never reaches the level that I[ ], as an educator[,] would accept as scientific truth."

Dr. Barnhart testified that 80% of his time was spent teaching at Michael Reese Hospital, a part of the University of Chicago system, and that 20% was spent in private practice.

Dr. Helgason, a neurologist, testified that she had reviewed claimant's medical records and depositions from Drs. Barnhart, Schreiber, and Fozard. Dr. Helgason testified that claimant had a longtime history of risk factors for stroke, such as diabetes, high cholesterol, and most notably, hypertension. She pointed to records from 1975 and 1990 indicating that claimant had an elevated blood pressure. Dr. Helgason stated that small vessel disease, a condition that actually leads to intracranial hemorrhage, is associated with the indications of hypertension shown in the decades of medical records. She did not think that claimant's job was the cause of claimant's intracranial hemorrhage. She opined:

"Well, the night of the speech, [claimant] had a massive intracranial hemorrhage. The week leading up to it, the records suggest that either [claimant] had a stroke that started a week before, maybe she had a little leakage, I don't know, maybe [claimant] had a hemorrhage then and then she had another hemorrhage the night the massive one started. But my general impression is that [claimant] had long-standing hypertension and had an intracranial hemorrhage related to a long-standing hypertension."

The arbitrator denied claimant's claim. He found that claimant had not been ordered or assigned by the employer to speak at the dinner. See 820 ILCS 305/11 (West 2004). The arbitrator also found no causation, stating:

"The Arbitrator does not find Dr. Fozard's opinions persuasive that [claimant's] intracerebral hemorrhage was related to the stress of her usual work activities. His opinions are contradicted not only by the other three experts, but the factual basis for his opinion is contradicted by other evidence. While [claimant] states that she felt stress in her job, [claimant] also states she felt stress at home. While there is an inference that [claimant] felt stress at work, [claimant] gave no examples other than she would get telephone calls at home and work long hours. None of the other experts identified these as causative factors. Furthermore, [claimant] did not go to the hospital administrator and advise that she was overworked or overly stressed in her position[;] rather[,] [claimant] expressed concern, by her words and actions, about losing some of her job duties during a reorganization of the work duties at the hospital. When Schubert arrived he, in fact, reduced [claimant's] job duties and, contrary to Dr. Fozard's suggestion, imposed no deadline on [claimant] to complete any of her long term tasks.

[Claimant's] testimony would suggest that the true source of her work stress was her concern that she would be replaced by a more educationally qualified candidate. The issue of stress associated with job loss has already been decided by this Commission. Stress associated with job loss or the fear of job loss[,] even though it has not occurred[,] cannot be the basis of a compensable claim because it is a fear faced by all workers on a daily basis and is not unique to any one employment."

The Commission reversed the decision of the arbitrator. It found that claimant's condition arose out of and in the course of her employment and that the dinner was not a voluntary recreational event. See 820 ILCS 305/11 (West 2004). Instead, the Commission found that claimant was assigned to present a speech, meaning her attendance was necessary, and that giving the speech aggravated or accelerated her preexisting condition and caused claimant's disability. The Commission awarded claimant medical expenses in the amount of $277,686.99. The Commission also awarded benefits for TTD and total permanent disability. The circuit court of Perry County confirmed the Commission.

The employer appeals.

## ANALYSIS

■ The employer asserts that claimant's attendance and speech at the retirement dinner was not a work activity covered by the Act. In order to be compensable, claimant's injury must arise out of and in the course of her employment. 820 ILCS 305/2 (West 2004). The employer contends that the dinner was a voluntary recreational activ-

ity that is specifically excluded from the Act. Section 11 of the Act provides:

> "Accidental injuries incurred while participating in voluntary recreational programs including but not limited to athletic events, parties[,] and picnics do not arise out of and in the course of the employment even though the employer pays some or all of the cost thereof. This exclusion shall not apply in the event that the injured employee was ordered or assigned by his employer to participate in the program." 820 ILCS 305/11 (West 2004).

The employer correctly points out that paying claimant for the food, the cake, and the hall does not, in itself, determine the issue. *Chicago Transit Authority v. Industrial Comm'n*, 238 Ill. App. 3d 224, 228, 606 N.E.2d 240, 243 (1992). Two nurses testified on behalf of the employer that they were not required to attend the dinner. The employer can also point to aspects of the event indicating it was a voluntary recreational activity. Invitations were sent. Claimant was not paid overtime. Indeed, there is no evidence that any of the hospital's employees were paid for attending.

Nonetheless, the Commission's decision is consistent with precedent. This case is factually distinct from instances where the activity has been found to be a voluntary recreational event. In the majority of cases cited by the employer, the appellate court affirmed the Commission's factual determination based on ample evidence that the employer either was not involved or did not pressure the claimant to attend the event. See *Kozak v. Industrial Comm'n*, 219 Ill. App. 3d 629, 579 N.E.2d 921 (1991) (the Commission found that a tennis tournament was a recreational event, not a promotional event); *Glassie v. Papergraphics, Inc.*, 248 Ill. App. 3d 621, 618 N.E.2d 885 (1993) (employees were told they could go home and not attend the holiday party); *Fischer v. Industrial Comm'n*, 142 Ill. App. 3d 298, 491 N.E.2d 1333 (1986) (the employer did not plan and run the golf outing). In only one case cited by the employer was the Commission found to be in error in finding that the event was not voluntary. *Minnesota Mining & Manufacturing Co. v. Industrial Comm'n*, 78 Ill. 2d 182, 399 N.E.2d 612 (1979) (*3M Co.*). Language from the concluding paragraph of *3M Co.* makes the distinction from this case readily apparent:

> "The Commission's finding that the golf outing and banquet were incident to the employment was contrary to the manifest weight of the evidence. The league was an employee organization which organized, managed, and supervised the golfing event. The 3M Company supplied neither the golfing equipment used at the outing nor the food consumed at the banquet. The company exerted no pressure or encouragement on employees to participate. It

derived no advertising benefit from the games, did not sponsor the tournament, and did not allow employees to take time off from work to participate. The trophies were presented at the banquet by the employees, and no speeches by company executives were made." *3M Co.*, 78 Ill. 2d at 190-91, 399 N.E.2d at 616.

■ In any event, the record here supports a finding that claimant was "ordered or assigned" to not only attend the event but also speak. See 820 ILCS 305/11 (West 2004). The Commission presented a detailed explanation for its finding:

"The Commission finds that [s]ection 11 of the Act concerning voluntary activities does not apply to the matter at bar as [claimant], a member of the management committee, helped plan this retirement dinner and worried that she would lose her job if she did not attend this dinner. The Commission finds that the management committee felt [claimant] was the most appropriate person to give the speech as [claimant] had worked the longest with Dr. Cawvey, the doctor who was retiring, and finds it credible that Schubert, [claimant's] boss and another member of the management committee, approved of [claimant's] selection as the person to give the speech. Based on these facts, the Commission finds it was reasonable that [claimant] felt she was obligated to attend the retirement dinner and give the speech during which she suffered a stroke. The dinner was not a voluntary recreational event. Rather, [claimant] was designated or assigned to give the speech, meaning [claimant's] attendance was necessary."

The employer contends that claimant and Dr. Fozard made contradictory statements on the topic. A review of their testimony reveals a consistent description—claimant was given the assignment of speaking as a part of her position at the hospital. The employer correctly points out that in describing claimant's position and how she came to make the speech, Dr. Fozard operated under the assumption that Schubert had ordered claimant to give the speech. Dr. Fozard testified that "[t]o the best of [his] knowledge" Schubert asked claimant to give the speech.

Claimant detailed how she came to make the speech:

"Mr. Schubert said, [']I think someone from the committee should give a speech.['] And one of the other ones, I don't know for sure who, said, [']Well, Mary should do that because she's the nursing director.['] And, see, I had worked longest with Dr. Cawvey, and he said that he thinks that would be appropriate as the director of nurses."

The employer's assertion that this contradicts Dr. Fozard is overblown. At most, Dr. Fozard's testimony differed from claimant's only on the issue of who originated the idea. Whether the chief of staff initiated

the idea or merely made the final determination is irrelevant. Either way, claimant was assigned to give the speech.

One can easily believe that claimant did not want to present a toast. Fear of public speaking is a common phenomenon. Given this, it is not difficult to accept that claimant was assigned the speech. The determination of this issue rests on an assessment of workplace culture and the credibility of the witnesses. These are questions of fact best decided by the Commission. *Chicago Transit Authority v. Industrial Comm'n*, 238 Ill. App. 3d 224, 229, 606 N.E.2d 240, 243 (1992). The Commission's finding is not against the manifest weight of the evidence.

The employer also contests the finding of causation. The employer presented the testimony of two experts who had reviewed claimant's medical records—Dr. Barnhart, an internist, and Dr. Helgason, a neurologist. Both of these physicians testified that claimant had long-standing hypertension. Both physicians pointed to medical records from a 1975 pregnancy and a 1990 bout with pneumonia indicating claimant had high blood pressure. Both physicians opined that this was a primary cause of claimant's debilitating condition.

On the other hand, claimant presented testimony from a treating physician, Dr. Fozard, and an expert neurologist, Dr. Schreiber, who had reviewed claimant's records. Both Dr. Fozard and Dr. Schreiber found the stress of the speech to be a causative factor.

The employer contends that Dr. Fozard was biased. Indeed, one cannot read his testimony without concluding he held claimant in high esteem. This, however, does not mean he was an untrustworthy witness. The Commission was in a better position to assess his credibility. See *Edward Hines Precision Components v. Industrial Comm'n*, 356 Ill. App. 3d 186, 196, 825 N.E.2d 773, 782 (2005).

Dr. Fozard's expertise is a more difficult question. Unlike the other experts, Dr. Fozard was not a specialist in the relevant fields. Dr. Fozard admits this. On the other hand, Dr. Fozard was the only treating physician to testify. Thus, the weight given to his testimony was a matter best decided by the Commission. See *Electro-Motive Division, General Motors Corp. v. Industrial Comm'n*, 240 Ill. App. 3d 768, 774, 608 N.E.2d 162, 166 (1992).

Dr. Schreiber also testified that the speech was a causative factor. The employer attacks Dr. Schreiber on the ground that Dr. Schreiber does not link claimant's hemorrhage to years of hypertension. Instead, argues the employer, Dr. Schreiber attributed the hemorrhage solely to a sudden increase in blood pressure from the stress of the speech. This, the employer contends, is contrary to the conclusions of the Commission.

The employer's description of the testimony of Dr. Schreiber and the decision of the Commission is inaccurate. Dr. Schreiber opined that the anxiety over the speech was the defining event causing the hemorrhage. He explained the significance of the speech as a stressor in the context of the general demands being made of claimant at work. Dr. Schreiber stated claimant had ongoing problems, but it was his opinion that she had an acute elevation of blood pressure related to the stress of giving the speech.

The Commission was forced to weigh competing expert testimony. Claimant's experts found that the stress of the speech was a causative factor for claimant's intracerebral hemorrhage. On the other hand, the employer presented expert testimony that attributed the incident to long-standing essential hypertension.

The employer's position, in the words of Dr. Barnhart, is that claimant "would have had a stroke at that time, regardless of the activity she was undertaking at that time." Underlying Dr. Barnhart's conclusion that the speech was not a causative factor was his opinion that a stressful incident could not sufficiently elevate blood pressure in a flight-or-fight reaction. The employer's other expert, Dr. Helgason, surmised, "[E]ither [claimant] had a stroke that started a week before, maybe she had a little leakage, I don't know, maybe [claimant] had a hemorrhage then and then she had another hemorrhage the night the massive one started." The Commission correctly noted Dr. Helgason admitted that it was possible that a stressful event could have caused a release of adrenaline that would result in elevated blood pressure causing increased stress on blood vessels.

The Commission's finding on causation was an exercise of its role as a trier of fact. The Commission elaborated on its finding:

"The Commission also finds that [claimant's] occupational activity, i.e., giving a speech, aggravated or accelerated her preexisting condition and caused [claimant's] disability. [Citations.] [Claimant] established a causal connection between these work activities and her current condition of ill-being. [Claimant] established that she was under [stress] at work and the fact that [claimant] was obligated to attend this party and give the speech. The Commission bases these findings on the medical testimony of Dr. Fozard that, after examining [claimant] on June 4, 1998, he noted [claimant] was[ ] stressed from her usual job duties and was under a considerable additional stress the night she had to give the speech and suffered the stroke. Dr. Fozard opined that the accumulated tension in [claimant's] life on February 22, 1998[,] contributed to her acute cerebrovascular accident [and] that all these stresses[,] combined with having to give the speech[,] put too much pressure on a weak blood vessel in her brain[,] and the bleeding occurred. The Com-

mission relies on Dr. Schreiber's medical opinions that [claimant's] acute systolic hypertension and the stresses associated with the speech directly caused her intracerebral hemorrhage. While noting that Drs. Barnhart and Helgason, [the employer's] [s]ection 12 examiners, opined that the cause of [claimant's] stroke was untreated hypertension[,] the Commission finds the testimony and medical opinions of Drs. Fozard and Schreiber more credible. The Commission also notes Dr. Helgason admitted that it was possible[,] if [claimant] was very nervous about giving the speech, this could have caused the release of adrenaline that would result in elevated blood pressure causing increased stresses on the blood vessels and possibly playing a role in the hemorrhage."

■ It is not difficult to accept the Commission's finding that claimant experienced stress in giving the speech. This stress could easily be seen as different from the stress generally experienced by the public. See *Baggett v. Industrial Comm'n*, 201 Ill. 2d 187, 775 N.E.2d 908 (2002). The record supports the conclusion that claimant had a preexisting condition of hypertension. The question, however, is whether the speech as a part of claimant's work was a causative factor that accelerated or aggravated claimant's condition. See *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 797 N.E.2d 665 (2003). The Commission was presented with conflicting expert testimony on the subject. Its determination was not against the manifest weight of the evidence.

## CONCLUSION

Accordingly, the order of the circuit court of Perry County confirming the decision of the Commission is hereby affirmed.

Affirmed.

McCULLOUGH, P.J., and HOFFMAN, CALLUM, and HOLDRIDGE, JJ., concur.