# Illinois Official Reports

## Appellate Court

*Sharwarko v. Illinois Workers' Compensation Comm'n*,
2015 IL App (1st) 131733WC

| | |
|---|---|
| Appellate Court Caption | DANIEL J. SHARWARKO, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (The Village of Oak Lawn, Appellee). |
| District & No. | First District, Workers' Compensation Commission Division Docket No. 1-13-1733WC |
| Filed | February 27, 2015 |
| Held (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court confirmed the decision of the Workers' Compensation Commission terminating claimant's temporary total disability benefits based on the finding that claimant had failed to prove he was permanently disabled as a result of the elbow injury he suffered while replacing a water meter while working as a water and sewer inspector for a village, especially when he failed to meet his burden of proving that he had a right to permanent total disability benefits on an "odd lot" theory. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-51346; the Hon. Robert Lopez Cepero, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | John T. Bowman, of Bowman & Corday, Ltd., of Chicago, for appellant. |
| | |
| | James Egan, of Keefe, Campbell, Biery & Associates, LLC, of Chicago, for appellee. |
| | |
| Panel | JUSTICE HOFFMAN delivered the judgment of the court, with opinion. |
| | Presiding Justice Holdridge and Justices Hudson, Harris, and Stewart concurred in the judgment and opinion. |

## OPINION

¶ 1    The claimant, Daniel J. Sharwarko, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2006)) seeking benefits for injuries he received while working for the Village of Oak Lawn (Village). The claimant now appeals from the circuit court judgment confirming the decision of the Illinois Workers' Compensation Commission (Commission) which terminated his temporary total disability (TTD) benefits on October 31, 2006; found that he failed to prove that he was permanently and totally disabled; denied his request for an award of penalties and fees; and refused to answer the questions he submitted pursuant to section 19(e) of the Act (820 ILCS 305/19(e) (West 2012)). For the reasons that follow, we affirm the judgment of the circuit court.

¶ 2    The following factual recitation is taken from the evidence adduced at the arbitration hearing. At all times relevant, the claimant was employed by the Village as a water and sewer inspector. The claimant testified that, on April 6, 2006, his duties included replacing a water meter on a parcel of property in the Village. According to the claimant, as he reached down to replace the meter, the wrench he was using slipped, and he struck his right elbow against a concrete wall. The claimant felt an immediate onset of pain and reported the incident to his supervisor. The claimant was directed to seek treatment at Concentra Medical Center (Concentra).

¶ 3    The claimant was seen at Concentra on April 7, 2006, complaining of pain in his right elbow and numbness in the little finger of his right hand. An examination of the claimant revealed tenderness over the medial epicondyle, and he was diagnosed with medial epicondylitis and ulnar neuritis. The claimant's right elbow was placed in an air cast, and he was instructed to take Aleve for his pain. He was released to full-duty work.

¶ 4    The claimant returned to Concentra for two follow-up visits. The record of his visit on April 24, 2006, states that the claimant reported no pain or other symptoms, and his physical examination was unremarkable. The examining physician released the claimant from care on that date.

¶ 5    The claimant had also elected to seek treatment from his personal physician, Dr. John Elser, who referred him to Dr. I. Harun Durudogan at the Southwest Center for Healthy Joints. Dr. Durudogan diagnosed the claimant as suffering from right median and ulnar nerve neuropraxia and prescribed physical therapy.

¶ 6    The claimant underwent physical therapy as prescribed. However, when the claimant saw Dr. Durudogan on June 6, 2006, he reported worsening pain and symptoms of paresthesias in the median and ulnar nerve distributions. On physical examination, Dr. Durudogan noted that the Tinel test was markedly positive at the right wrist and elbow, and the Fallon test was markedly positive at the wrist. Evidence of early ulnar atrophy was also noted. Dr. Durudogan recommended that the claimant undergo an anterior ulnar nerve transposition and a revision right carpal tunnel release. Dr. Durudogan restricted the claimant's work duties to no use of his right hand.

¶ 7    The Village accommodated the work restrictions imposed by Dr. Durudogan, and the claimant was assigned to routine maintenance and meter-reading duties.

¶ 8    At the request of the Village, the claimant was seen by Dr. David Tulipan on July 6, 2006. Following his examination, Dr. Tulipan opined that the claimant's elbow contusion was the likely cause of his cubital tunnel syndrome, but not his carpal tunnel syndrome. Although he was of the opinion that the claimant was capable of working, Dr. Tulipan believed that the claimant would be a surgical candidate in the future. In his report, Dr. Tulipan noted that, if the claimant had the recommended surgery, he would be able to do some light work within three to four months thereafter. He recommended that the claimant have an EMG/NCS test.

¶ 9    An EMG/NCS performed on the claimant on July 28, 2006, showed evidence of: right ulnar nerve neuropathy at the elbow; chronic right median nerve compression neuropathy at the wrist; and abnormally slow nerve conduction in the forearm segments of the right median and ulnar motor nerves.

¶ 10    When the claimant saw Dr. Durudogan on August 1, 2006, he continued to complain of persistent pain and paresthesias in the median and ulnar nerve distributions. Dr. Durudogan again recommended surgery.

¶ 11    On August 21, 2006, Dr. Durudogan operated on the claimant, performing an open right carpal tunnel release and a right cubital tunnel release. Subsequent to his surgery, the claimant was directed to remain off of work, and he began physical therapy. The claimant acknowledged that, until he was taken off of work following his surgery, the Village had accommodated the one-handed work restriction imposed by Dr. Durudogan.

¶ 12    On August 28, 2006, Dr. Tulipan issued an addendum to the report of his examination of the claimant. He found that the surgery performed by Dr. Durudogan was reasonable and that the claimant's work-accident was probably the cause of his cubital tunnel syndrome. Dr. Tulipan opined that the problems which the claimant was experiencing with his median nerve were chronic in nature, dating back to his childhood.

¶ 13    The claimant continued under the care of Dr. Durudogan postoperatively. When he saw the doctor on September 19, 2006, the claimant complained of significant persistent pain and paresthesias in the median and ulnar nerve distributions and stated that the pain had become worse after his surgery. Dr. Durudogan prescribed continued physical therapy and splint use, and he released the claimant to work on September 20, 2006, with the one-hand restriction.

¶ 14       There is a note in the record written by Kathleen Fitzgerald, a nurse who was assigned as a case manager to the claimant's case by the Village's insurance carrier, which states that she called the Village on September 19, 2006, and spoke to Sue Lanham. The note goes on to state: "Light duty cannot be accommodated at this time."

¶ 15       The Village offered certain of its employees an early retirement package which the claimant accepted on October 3, 2006.

¶ 16       On October 20, 2006, the claimant was seen by Dr. Durudogan. The record contains a copy of a note signed by the doctor stating that the claimant is unable to return to work until after his next office visit, which was scheduled for December 1, 2006. The record also contains a copy of a letter from Dr. Durudogan to Dr. Elser, dated October 20, 2006, which states that Dr. Durudogan's "recommendations are for no work with the right upper extremity."

¶ 17       The claimant's request to retire was granted on October 31, 2006, and he began receiving a pension of $5,120 per month. There is no evidence in the record that, following the claimant's surgery on August 21, 2006, until his retirement on October 31, 2006, the Village offered him any work within his restrictions which he refused. However, Steven Barrett, the director of public works for the Village, testified that, if the claimant had not retired, the Village would have accommodated his one-handed work restriction. According to Barrett, the Village had accommodated other employees working under light-duty restrictions, including one whose restrictions had been ongoing for approximately eight years.

¶ 18       The Village paid TTD benefits to the claimant from the date of his surgery on August 21, 2006, until October 31, 2006, when it terminated those payments by reason of his voluntary retirement.

¶ 19       Following retirement, the claimant continued to receive medical treatment for problems with his right elbow, including ulnar nerve pain. His medical records reflect that he continued to demonstrate persistent ulnar neuropraxia with muscle atrophy and paresthesias in the median and ulnar nerve distributions. Dr. Durudogan continued to prescribe physical therapy. The record contains a letter from Dr. Durudogan to Dr. Elser, dated December 12, 2006, in which Dr. Durudogan described the claimant's medical condition on that date and goes on to state: "No work with the right upper extremity until further notice."

¶ 20       Following an examination of the claimant on March 1, 2007, Dr. Durudogan noted that the Tinel test was markedly positive at the right elbow. He recommended that the claimant undergo revision ulnar release surgery and referred the claimant to Dr. Ramasamy Kalimuthu for a second opinion. Additionally, Dr. Durudogan restricted the claimant from performing any work with his right arm.

¶ 21       The claimant was seen by Dr. Kalimuthu on March 15, 2007. After examining the claimant, Dr. Kalimuthu diagnosed severe ulnar neuropathy in the motor and sensory branch of the ulnar nerve and muscle atrophy with sensory loss in the ulnar nerve distribution. Before formulating a treatment plan, Dr. Kalimuthu ordered an updated EMG, which was performed on March 26, 2007. The results of that test were consistent with severe right ulnar neuropathy and severe right median sensorimotor neuropathy across the carpal tunnel, and demonstrated a deterioration of ulnar nerve function when compared with the EMG/NCV of July 28, 2006.

¶ 22   After reviewing the results of the EMG, Drs. Durudogan and Kalimuthu both recommended that the claimant undergo revision ulnar release surgery. Following the recommendation, the Village requested that the claimant again be examined by Dr. Tulipan. On April 11, 2007, Dr. Tulipan examined the claimant and also recommended surgical intervention.

¶ 23   On May 11, 2007, the claimant underwent a second right elbow surgery performed by Dr. Tulipan. The surgery consisted of an exploration and compression of the ulnar nerve and a neuroma excision with Neurogen tube placement. The neuroma encompassed approximately 70% of the ulnar nerve and the ischemic nerve was removed. Dr. Tulipan was of the opinion that the claimant's prognosis was "poor" as the ulnar nerve was "badly damaged." It is clear that the claimant continued to treat with Dr. Tulipan postoperatively. However, none of the doctor's postoperative records were introduced in evidence.

¶ 24   On January 17, 2008, the claimant was seen by Dr. Demaceo Howard at the Advanced Pain Management Institute on referral from Dr. Tulipan. The claimant complained of pain and numbness in his right arm and the fourth and fifth fingers of his right hand. Dr. Howard provided pain management treatment. When the claimant presented for follow-up visits with Dr. Howard on February 15, 2008, and June 16, 2008, he continued complaining of pain and numbness and reported little or no improvement with medication. Dr. Howard recommended the use of a spinal cord simulator on a trial basis.

¶ 25   At the request of the Village, the claimant was examined by Dr. Peter Hoepfner, a hand surgeon, on September 18, 2008. Following his examination of the claimant, Dr. Hoepfner diagnosed persistent right upper extremity neuropathy and found the claimant's prognosis guarded. Dr. Hoepfner opined that the claimant suffered an ulnar nerve contusion as a result of his accident on April 6, 2006, which caused ulnar neuritis, muscular atrophy of the intrinsic musculature of the right arm, and sensory dysfunction. He also opined that the condition of the claimant's median nerve was chronic and unrelated to his work injury. According to Dr. Hoepfner, the claimant was capable of performing "light, sedentary work with his right upper extremity *** [and] capable of using his right hand as a light assist to his dominant left hand." He concluded that the claimant "will likely never be capable of full, unrestricted activity with his right upper extremity."

¶ 26   On the recommendation of Dr. Hoepfner, the claimant received pain management treatments from Dr. Maria Pilar-Estilo, consisting of a right ulnar nerve block on December 4, 2008, and stellate ganglion blocks on January 15, 22 and 29, 2009.

¶ 27   The claimant was examined by Dr. Howard Konowitz, a pain specialist, on April 23, 2009. He complained of right arm dysesthesias in the ulnar nerve distribution along with the loss of muscle function and wrist pain. Following his examination, Dr. Konowitz concluded that the claimant had dense ulnar sensory motor neuropathy, which was the primary cause of his pain, and scarring of the median nerve, which also contributed to his pain. Dr. Konowitz recommended that the claimant undergo a diagnostic ultrasound and an EMG and prescribed medication.

¶ 28   The claimant had both of the recommended tests. The diagnostic ultrasound showed a "[v]ery significant recurrent post-operative ulnar nerve neuroma." Dr. Konowitz noted in his record of the claimant's visit of June 3, 2009, that his recent EMG showed complete ulnar neuropraxia, secondary to chronic severe ulnar neuropathy. He recommended that the claimant receive neurolytic block therapy and prescribed pain medication.

¶ 29 On June 24, 2009, Dr. Konowitz administered the prescribed ulnar neurolytic block to the claimant. When the claimant returned to see Dr. Konowitz on July 15, 2009, he reported improvement in his symptoms, although the sensitivity along the ulnar surface of his hand was still present and he continued to experience numbness and tingling in the fourth finger of his right hand. Dr. Konowitz recommended another ultrasound and neurolytic block.

¶ 30 When the claimant saw Dr. Konowitz on October 8, 2009, he still reported sensitivity in the interior aspect of his right upper arm and numbness. On examination, Dr. Konowitz noted limited motion of the fourth and fifth fingers on the claimant's right hand and interosseous musculature. He also noted marked improvement following the ulnar nerve phenol injection. The doctor ordered an ultrasound and prescribed medication for the claimant.

¶ 31 The ultrasound, which was performed on October 21, 2009, revealed "significant ulnar nerve and median nerve entrapment."

¶ 32 When the claimant saw Dr. Konowitz for a follow-up appointment on November 19, 2009, he reported on-going pain in his right arm, but improvement in his elbow and fingers. Following his examination of the claimant, Dr. Konowitz noted marked improvement in the functionality of the claimant's right arm and the ulnar nerve distribution. He concluded that further ulnar neurolytic blocks were not warranted, but he recommended a median nerve injection and continued to prescribe pain medication for the claimant.

¶ 33 The claimant had a median nerve injection on December 16, 2009, and returned to see Dr. Konowitz on January 13, 2010. During that visit, the claimant continued complaining of pain and numbness over his right medial elbow. On examination, the doctor noted dysesthesias over the ulnar nerve at the elbow, decreased sensation on the ulnar nerve side of the claimant's right hand, and clawing in the fourth and fifth fingers of his right hand. Dr. Konowitz ordered a repeat ulnar neurolytic block and prescribed medication.

¶ 34 Following the repeat ulnar neurolytic block, the claimant returned to see Dr. Konowitz on February 17, 2010, reporting pain relief in the region of his right upper bicep, but no relief of the pain in his elbow. He also reported numbness in the first and third fingers of his right hand. On examination, Dr. Konowitz noted that the claimant's right arm was stiff and that he was unable to fully extend the fourth and fifth fingers of his right hand. Dr. Konowitz continued to prescribe medication.

¶ 35 When the claimant returned to see Dr. Konowitz, on March 31, 2010, he continued to report radiating pain in his right hand with numbness over the fifth digit. Following his examination of the claimant, Dr. Konowitz noted that the claimant's upper arm had improved, but found no improvement in the claimant's elbow and hand. Dr. Konowitz concluded that the claimant had reached maximum medical improvement (MMI) with respect to his ulnar neuropathy. Nevertheless, Dr. Konowitz continued to prescribe pain medication which he believed would be necessary to wean the claimant from the multiple medications he was taking.

¶ 36 The claimant continued under the care of Dr. Konowitz in the following months. When he saw the doctor in May and August of 2010, the claimant complained of pain over the ulnar nerve at the right elbow, along with pain and numbness in the fourth and fifth fingers of his right hand. Dr. Konowitz continued prescribing medication for the claimant and recommended home exercises.

¶ 37    On November 16, 2010, the claimant was examined at his attorney's request by Dr. Jeffrey Coe, a specialist in occupational medicine. On examination, Dr. Coe observed that the claimant had clawing in the fourth and fifth fingers of his right hand and difficulty gripping with the hand. Dr. Coe noted marked hypersensitivity over the scar along the medial border of the claimant's right forearm; muscle atrophy at his right elbow, forearm and hand; and a clawing deformity of the fourth and fifth fingers of the right hand, with burning dysesthesias radiating to the fingers upon movement, stiffness and reduced range of motion. Dr. Coe opined that the claimant's condition was permanent and causally related to his work injury of April 6, 2006. He concluded that the claimant's injuries would have prohibited him from obtaining gainful employment from the time of his retirement on October 31, 2006, through the date of his examination. He also opined that the claimant is unable to carry out gainful employment because he cannot use his right arm. However, on cross-examination, Dr. Coe conceded that the claimant might be able to perform left-handed work as long as he did not need to travel much and his pain medication did not preclude his return to gainful employment.

¶ 38    The claimant was seen by Dr. Konowitz on March 2, 2011. At that time, the claimant reported significant improvement in his ulnar nerve symptoms and in his overall functioning. Dr. Konowitz noted that the claimant's right arm and hand functions were limited by both the underlying pathology and pain. Dr. Konowitz testified that he intended to continue weaning the claimant off of his pain medication, but anticipated that he would need some residual pain medication.

¶ 39    At the request of the claimant's attorney, Edward Pagella, a vocational rehabilitation expert, conducted a vocational assessment of the claimant on May 13, 2011. In his written report dated June 20, 2011, Pagella noted that the claimant stated that he had not looked for work since retiring from the Village. After interviewing the claimant, reviewing his medical records and the depositions of Drs. Coe and Konowitz, and considering the claimant's age, education, skills and work history, Pagella opined that there is no stable labor market for him. From the evidence of record, it is clear that Pagella did not perform a job search.

¶ 40    On August 1, 2011, the claimant was examined by Dr. Michael Vender, a hand surgeon, at the request of the Village. In his report of that examination, Dr. Vender noted that the claimant stated that he had experienced significant improvement in the pain and dysesthesia in the ulnar aspect of his right hand, but complained of continuing abnormal sensation in the ulnar nerve distribution and the volar aspect of his right wrist. On examination, Dr. Vender found the range of motion in the claimant's right elbow and wrist to be good, but with some pain at extremes. Dr. Vender noted that his findings on examination of the claimant were consistent with his complaints and the diagnosis of injury to his ulnar nerve. He concluded that the claimant was at MMI and that he has "residuals in the way of ulnar nerve abnormality and dysfunction." Dr. Vender opined that the claimant's work activity with his right arm would be "limited," but that he has function in the arm.

¶ 41    At arbitration, the claimant testified that he still experiences pain, tingling and numbness in his right arm and hand and that he has lost grip strength and fine motor skills. According to the claimant, he can lift only one-half pound with his right hand and his symptoms are aggravated when he attempts to use his right hand to perform household chores. The claimant testified that, since his accident, he has never been released to two-handed work. He admitted that he has not looked for work since retiring from the Village.

¶ 42        Following a hearing, the arbitrator found that the claimant suffered a work-related accident while in the employ of the Village on April 6, 2006. The arbitrator found that, as a result of the accident, the claimant suffered an injury to his right elbow and ulnar nerve, but not to the median nerve. The arbitrator awarded the claimant $188^3/_7$ weeks of TTD benefits, ending on March 31, 2010, and 202.4 weeks of permanent partial disability (PPD) benefits for an 80% permanent loss of use of his right arm. Additionally, the arbitrator denied the claimant's petition for an award of penalties pursuant to sections 19(k) and 19(l) of the Act (820 ILCS 305/19(k), (l) (West 2010)), and attorney fees pursuant to section 16 of the Act (820 ILCS 305/16 (West 2010)).

¶ 43        Both the claimant and the Village filed for a review of the arbitrator's decision before the Commission. In a unanimous decision, the Commission modified the arbitrator's decision by reducing the claimant's TTD award to $10^2/_7$ weeks of benefits, ending on October 31, 2006, the date upon which the claimant voluntarily retired. After concluding that the claimant failed to meet his burden of proving that he was permanently and totally disabled, the Commission affirmed the arbitrator's award of 202.4 weeks of PPD benefits for the claimant's 80% permanent loss of use of his right arm. The Commission also affirmed and adopted the arbitrator's denial of penalties and attorney fees, finding that the Village's termination of TTD benefits upon the claimant's retirement was neither unreasonable nor vexatious. Finally, the Commission declined to answer the five questions posed to it by the claimant pursuant to section 19(e) of the Act (820 ILCS 305/19(e) (West 2012)), finding that they were not timely filed.

¶ 44        The claimant sought a judicial review of the Commission's decision in the circuit court of Cook County. The circuit court confirmed the Commission's decision, and this appeal followed.

¶ 45        For his first assignment of error, the claimant argues that the Commission's decision to terminate his TTD benefits on October 31, 2006, the day he retired, is against the manifest weight of the evidence. He asserts that he is entitled to TTD benefits from August 21, 2006, the date of his first surgery, through March 31, 2010, the date upon which Dr. Konowitz found that he had reached MMI.

¶ 46        The Village argues, as the Commission found, that, by voluntarily retiring and not looking for work thereafter, the claimant indicated that he had no intention of returning to the workforce in any capacity, at any time. The Commission concluded that the claimant's voluntary retirement was the equivalent of refusing the accommodated duty which the Village had provided before the claimant's surgery, and as a consequence he was not entitled to TTD benefits after October 31, 2006. We agree.

¶ 47        An employee is temporarily and totally disabled from the time that an injury incapacitates him from working until such time as he is as far recovered or restored as the permanent character of his injury will permit. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118 (1990). According to our supreme court, the dispositive inquiry is whether the claimant has reached MMI. *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 236 Ill. 2d 132, 142 (2010). There are, however, three recognized exceptions. TTD benefits may be suspended or terminated before an employee reaches MMI if he: (1) refuses to submit to medical, surgical, or hospital treatment essential to his recovery; (2) refuses to cooperate in good faith with rehabilitation efforts; or (3) refuses work falling within the

- 8 -

physical restrictions prescribed by his doctor. *Interstate Scaffolding, Inc*., 236 Ill. 2d at 146-47.

¶ 48    In this case, Dr. Durodogan imposed the one-handed work restriction following the claimant's first surgery, and there is no evidence that the claimant was taken off of work prior to his second surgery on May 11, 2007. Barrett testified that, if the claimant had not retired and continued working, the Village would have accommodated his one-handed work restriction. Further, contrary to Dr. Coe's opinion, Drs. Hoepfner, Vedner and Konowitz opined that the claimant was able to do light, sedentary work with his right arm. Whether the claimant was capable of working within the restrictions imposed by Dr. Durodogan was a question of fact to be resolved by the Commission. See *Ester v. Industrial Comm'n*, 48 Ill. 2d 121, 125 (1971); *Whitney Productions, Inc. v. Industrial Comm'n*, 274 Ill. App. 3d 28, 30 (1995). While Dr. Coe offered a conflicting opinion from those of Drs. Hoepfner, Vedner and Konowitz on the question of the claimant's ability to work, it was the Commission's function to resolve the conflicting medical opinions. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253 (1980). The Commission obviously relied upon the opinions of Drs. Hoepfner, Vedner and Konowitz in concluding that the claimant "did not prove that he could not work." And based upon the opinions of Drs. Hoepfner, Vedner and Konowitz, we cannot say that the Commission's determination of this issue is against the manifest weight of the evidence as a contrary conclusion is not clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291 (1992).

¶ 49    The purpose of the Act is to compensate an employee for lost earnings resulting from work-related injuries. *Freeman United Coal Mining Co. v. Industrial Comm'n*, 99 Ill. 2d 487, 496 (1984). When, as in this case, work within an injured employee's medical restrictions is available and the employee does not avail himself of the opportunity by voluntarily retiring, continued payment of TTD benefits does not further that purpose. In such a case, the employee's lost earnings are the result of his volitional act of removing himself from the work force, not his work-related injuries. As we have held before, to establish entitlement to TTD benefits, an injured employee must prove not only that he did not work, but also that he was unable to work. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d 828, 832 (2002). We believe, as did the Commission, that when work for an injured employee falling within his medical restrictions is available, the employee's voluntary retirement is the equivalent to a refusal to work within those restrictions, authorizing the termination of TTD benefits before the employee has reached MMI. See *City of Granite City v. Industrial Comm'n*, 279 Ill. App. 3d 1087, 1090 (1996).

¶ 50    Just as the Commission, we are not unmindful that the claimant would have been off of work for some period of time following his second surgery for purely medical reasons. However, by failing to introduce any of Dr. Tulipan's postoperative records in evidence, or any other medical records authorizing the claimant to remain off of work following his second surgery, the claimant failed to meet his burden to prove the period of time following his second surgery when he could not work even within his restrictions.

¶ 51    Based upon the foregoing analysis, we find that the Commission's decision to deny the claimant TTD benefits following his retirement on October 31, 2006, is not against the manifest weight of the evidence. See *Lukasik v. Industrial Comm'n*, 124 Ill. App. 3d 609, 614-16 (1984).

¶ 52 Next, the claimant argues that the Commission's finding that he failed to meet his burden of proving entitlement to permanent total disability (PTD) benefits on an "odd lot" theory is against the manifest weight of the evidence. His argument in this regard rests upon the opinions of Dr. Coe and his vocational rehabilitation expert, Pagella. Dr. Coe opined that, from a medical perspective, the claimant would be unable to carry out gainful employment. Pagella opined that there is no stable labor market for an individual with the claimant's vocational profile and physical limitations.

¶ 53 An employee is totally and permanently disabled when he is unable to make some contribution to industry sufficient to justify the payment of wages. *A.M.T.C. of Illinois, Inc., Aero Mayflower Transit Co. v. Industrial Comm'n*, 77 Ill. 2d 482, 487 (1979). If, as in this case, a claimant's disability is of such a nature that he is not obviously unemployable, or there is no medical evidence to support a claim of total disability, the burden is upon the claimant to prove by a preponderance of the evidence that he fits into an "odd lot" category; that being an individual who, although not altogether incapacitated, is so handicapped that he is not regularly employable in any well-known branch of the labor market. *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 546-47 (1981). A claimant ordinarily satisfies his burden in one of two ways: (1) by showing diligent but unsuccessful attempts to find work, or (2) by showing that, because of his age, skills, training, and work history, he will not be regularly employed in a well-known branch of the labor market. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 544 (2007). Once a claimant establishes that he falls within an "odd lot" category, the burden shifts to the employer to prove that the claimant is employable in a stable labor market and that such a market exists. *Id.* Whether a claimant falls within the "odd lot" category is a question of fact to be resolved by the Commission, and its determination will not be disturbed on review unless it is against the manifest weight of the evidence. *Id.*

¶ 54 Dr. Coe is the only physician to opine that the claimant is incapable of gainful employment from a medical perspective. However, his opinion was not based upon any conclusion that one-handed work would be harmful to the claimant's medical condition. Rather, Dr. Coe opined that the claimant was incapable of gainful employment because "he really can't use his right arm for anything." Nevertheless, Dr. Coe conceded in his deposition that the claimant might be able to perform left-handed work. In contrast, Drs. Hoepfner and Vedner were of the opinion that the claimant is able to perform light, sedentary work with his right arm. Although the Commission made its own factual findings as to the nature and extent of the claimant's injuries, it also affirmed and adopted the arbitrator's conclusions in that regard. The arbitrator specifically credited the medical opinions of Drs. Hoepfner and Vedner for the finding that the claimant was able to work.

¶ 55 The claimant's vocational rehabilitation expert, Pagella, opined that there is no stable labor market for an individual of the claimant's vocational profile, including his physical limitations, and, as the claimant notes, the Village did not present conflicting evidence from a vocational rehabilitation expert. However, the Village accommodated the claimant's one-handed work restriction prior to his retirement, and Barrett testified that, had the claimant not retired, the Village would have continued to accommodate his restrictions as it had done for other employees. Further, it is undisputed that neither the claimant nor Pagella conducted a job search, and the claimant admitted that, since retiring, he has not looked for work.

¶ 56    It was the function of the Commission to judge the credibility of the witnesses, determine the weight to be given their testimony, and resolve the conflicting medical evidence. *O'Dette*, 79 Ill. 2d at 253. Where conflicting inferences might be drawn from other evidence in the record, the Commission was not compelled to accept Pagella's opinion testimony simply because it was not rebutted by a vocational rehabilitation expert called on behalf of the Village. See *McRae v. Industrial Comm'n*, 285 Ill. App. 3d 448, 452 (1996).

¶ 57    For the Commission's finding, that the claimant failed to prove his entitlement to PTD benefits under the "odd-lot" theory, to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Alano v. Industrial Comm'n*, 282 Ill. App. 3d 531, 536 (1996). The appropriate test is whether there is sufficient evidence in the record to support the Commission's decision. *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450 (1982). Based on the record before us, we believe that sufficient evidence exists.

¶ 58    From the time of his retirement until the arbitration hearing, the claimant made no attempt to find work and Pagella did not perform any job search. Consequently, in order to establish his entitlement to PTD benefits on an "odd lot" theory, the claimant was required to show that, because of his age, skills, training, and work history, he will not be regularly employed in a well-known branch of the labor market. Dr. Coe and Pagella both opined that the claimant is incapable of gainful employment. However, we believe that the record contains sufficient evidence calling into question their opinions in this regard. The claimant was capable of working within his medical restrictions prior to his first surgery. Dr. Durudogan imposed the same one-handed work restriction following the claimant's first surgery, and Barrett testified that, had the claimant not retired, the Village would have continued to accommodate that restriction. Further, and contrary to Dr. Coe's opinion, Drs. Hoepfner and Vedner opined that the claimant is able to perform light, sedentary work with his right arm. We conclude, therefore, that there is sufficient evidence in the record to support the Commission's determination that the claimant failed to meet his burden of proving his entitlement to PTD benefits based on an "odd lot" theory. Stated otherwise, the Commission's resolution of the issue is not against the manifest weight of the evidence.

¶ 59    Next, the claimant argues that the Commission's decision to deny his request for an award of penalties pursuant to sections 19(k) and 19(*l*) of the Act and an award of attorney fees pursuant to section 16 of the Act is against the manifest weight of the evidence. His argument in this regard is based solely upon the Village's termination of TTD benefits on October 31, 2006, the day he retired. The arbitrator denied the claimant's request for an award of penalties and attorney fees, reasoning that the Village's termination of TTD benefits on the day of his voluntary retirement was not unreasonable. The arbitrator noted that the termination of the claimant's TTD benefits on the day of his retirement came before the supreme court's decision in *Interstate Scaffolding* and was based upon a reasonable interpretation of the law existing at that time. For its part, the Commission denied the claimant's request for an award of penalties and attorney fees because it determined that the claimant's entitlement to TTD benefits ended when he voluntarily retired on October 31, 2006.

¶ 60    Based upon our earlier holding that the Commission did not err in its decision to terminate the claimant's TTD benefits on October 31, 2006, the date of his voluntary retirement, it follows that we reject the claimant's argument that the Commission erred in denying his request for an award of penalties and attorney fees.

¶ 61        Finally, the claimant argues that the Commission erred as a matter of law in failing to answer the five questions which he submitted pursuant to section 19(e) of the Act (820 ILCS 305/19(e) (West 2012)). Noting that the Commission's stated reason for refusing to answer the questions posed was that they were filed late, depriving the Village of an opportunity to respond, the claimant asserts that section 19(e) contains no time limit for submitting questions and makes no provision for a response by the opposing party.

¶ 62        Section 19(e) of the Act provides, in relevant part, as follows:

> "In any case the Commission in its [discretion] may find specially upon any question or questions of law or fact which shall be submitted in writing by either party whether ultimate or otherwise; provided that on issues other than nature and extent of the disability, if any, the Commission in its decision shall find specially upon any question or questions of law or fact, whether ultimate or otherwise, which are submitted in writing by either party; provided further that not more than 5 such questions may be submitted by either party." 820 ILCS 305/19(e) (West 2012).

¶ 63        It is true, as the claimant argues, section 19(e) places no time limit on the submission of questions to the Commission. Nevertheless, we believe it is unreasonable to interpret the statute as limiting the Commission's ability to impose some reasonable time limit. The Commission is vested with the power to enact procedural rules governing practice before it. 820 ILCS 305/16 (West 2012). However, it has yet to promulgate a rule setting the time frame within which questions posed pursuant to section 19(e) must be submitted.

¶ 64        In this case, the Commission held that questions submitted three days before oral argument were untimely, because the Village was deprived of any reasonable ability to object. However, the Village states in its brief that it did object when the matter came for hearing before the Commission.

¶ 65        The record further reflects that the oral argument before the Commission in this case took place on August 2, 2012, and its written decision was not filed until October 1, 2012. We are at a loss to understand why questions posed to the Commission before oral argument would be found untimely. Nevertheless, we find whatever error that the Commission committed by failing to answer the five questions posed by the claimant does not require reversal as the claimant has made no showing that he was prejudiced by the Commission's failure to answer the questions posed.

¶ 66        The first question posed by the claimant was: "Does the record contain evidence that any doctor, whether treating or otherwise, released Petitioner to return to full duty, unrestricted work?" In its decision, the Commission twice acknowledged that the claimant testified that he had not been released to full unrestricted work, and there is no reference to any contrary evidence in the decision. Further, it is undisputed that the claimant suffered a severe and permanent injury, resulting in very limited use of his right arm, as the Commission so found. In light of these findings contained within the Commission's decision, the claimant can show no prejudice by the Commission's failure to answer the first question.

¶ 67        The second question posed to the Commission was: "Did the Respondent comply with Section 7110.10 of the Illinois Administrative Code by providing for vocational rehabilitation of Petitioner when the period of total incapacity for work exceeded 120 continuous days?" The claimant can show no prejudice in the Commission's failure to answer this question as his entitlement to vocational rehabilitation services was not raised in his "Statement of Exceptions" before the Commission, nor was it raised as an issue in his

opening brief with this court. By failing to raise the question of his entitlement to vocational rehabilitation services before the Commission and in his opening brief before this court, the claimant has forfeited the issue. See *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327, 336 (1980) (failure to raise an issue before the Commission); *Archer Daniels Midland Co. v. City of Chicago*, 294 Ill. App. 3d 186, 190 (1997) (failure to raise an issue in appellant's opening brief). Consequently, any answer that the Commission may have made to the question would be totally irrelevant to the issues raised in this appeal.

¶ 68     For his third question posed to the Commission, the claimant asked: "How does the Commission rule regarding the Respondent's *Ghere* objection to Dr. Konowitz's testimony regarding Petitioner's ability to work?" The record discloses that, when deposed, Dr. Konowitz was asked: "[S]ince you first saw him [the claimant] on April 23rd, 2009, is there any type of gainful employment that you believe that Mr. Sharwarko could have been engaged in?" The Village's attorney interposed an objection based, *inter alia*, upon the holding in *Ghere v. Industrial Comm'n*, 278 Ill. App. 3d 840 (1996). See also 820 ILCS 305/12 (West 2010). Answering over the objection, Dr. Konowitz stated: "Beyond a sedentary type position, those are probably reasonable. Beyond that, from a use of the hand in his past employment type of function, I don't see that as ever occurring." The arbitrator sustained the Village's *Ghere* objection, and the claimant raised the propriety of the ruling in his "Statement of Exceptions" filed with the Commission on review. The Commission never specifically ruled upon the objection in its decision. However, a close reading of the Commission's decision reflects that the Commission did in fact rely upon the very testimony of Dr. Konowitz that was the subject of the Village's *Ghere* objection. On page 8 of its decision, the Commission wrote: "Dr. Konowitz testified that he did not see Petitioner [the claimant] employed beyond a sedentary type of position and from his employment history, he did not see that as a possibility. *** He opined that Petitioner would not be able to go back to work as a maintenance man." From this passage in the Commission's decision, it is clear that, by implication, the Commission overruled the Village's *Ghere* objection and considered Dr. Konowitz's testimony regarding the claimant's ability to work. We fail to see, therefore, how the claimant was prejudiced by the Commission's failure to answer the third question which he posed.

¶ 69     The claimant's fourth question was: "Did the respondent present any evidence to contradict the vocational assessment report of Edward Pagella (Pet. Ex. No. 11) dated June 20, 2011?" Although the Commission declined to answer the question, the first one-half of page 10 of the Commission's decision is a recitation of the evidence which it relied upon in rejecting Pagella's vocational assessment that the claimant is unemployable. We find, therefore, that the claimant suffered no prejudice by the Commission's refusal to answer this question.

¶ 70     The fifth and final question posed to the Commission was: "Does the Commission find the Respondent's refusal to pay TTD benefits after October 31, 2006[,] to be unreasonable and vexatious entitling Petitioner to penalties and attorney fees?" In point of fact, the Commission did answer this question on page 10 of its decision when it held: "The evidence and testimony finds Respondent's termination of benefits not to be unreasonable or vexatious under the circumstances presented here."

¶ 71     Finding that the claimant can establish no prejudice in the Commission's failure to answer the first four questions he submitted pursuant to section 19(e) and that the

Commission did in fact answer the fifth question, we conclude that no basis exists to disturb the Commission's decision for any violation of section 19(e) of the Act.

¶ 72　　　For the foregoing reasons, we affirm the judgment of the circuit court which confirmed the Commission's decision.

¶ 73　　　Affirmed.